State *v.* Hoyt.

# SUPREME COURT OF ERRORS.

## HELD AT BRIDGEPORT FOR THE COUNTY OF FAIRFIELD,

### ON THE THIRD TUESDAY OF MARCH, 1880.

### Present,

PARK, C. J., CARPENTER, PARDEE, LOOMIS AND GRANGER, JS.

THE STATE *vs.* EDWIN HOYT.

In showing ground for a challenge for cause in a criminal case it is not necessary that the juror be sworn on his *voir dire.* The common law practice has never been adopted here, and we have no statute on the subject.

The matter may be safely left to the discretion of the court. A request that a juror should be so sworn would undoubtedly be granted in all cases of grave importance.

If the right to demand it existed, a neglect to request it would be a waiver of the right.

Where a challenge for cause is overruled and the accused challenges the same juror peremptorily, the accused is not aggrieved by the decision of the court, where the impaneling of the jury was completed without exhausting his right of peremptory challenge.

Whether, to make the objection available, the record must not show that the right of peremptory challenge was exhausted: *Quære.* Several of the authorities so hold.

At the time of the commission of a homicide the State was by statute allowed only two peremptory challenges. By an act passed afterwards, but before the trial, the State was allowed a greater number. Held that the act related solely to the mode of procedure and therefore governed the trial of the case.

An opinion that an accused person is guilty of a homicide, formed without consideration from reading an account of it in a newspaper and dependent upon the correctness of the account, but which is so indefinite as not to create a bias in the person's mind so that he can not try the case impartially upon the evidence, does not disqualify him from sitting upon the trial as a juror.

The defendant in a criminal case has no right to require that the jury should be polled. Such a right has never been recognized in this state, and there are no considerations of justice or expediency that require an adoption of the practice. Our practice in a more convenient way effects the same thing.

It is doubtful whether at common law it was the absolute right of the accused.

State *v.* Hoyt.

The testimony in a criminal case was taken down, under the order of the court, by a stenographer, and delivered written out to the counsel the next morning. In the course of the examination the court declined to stop a witness, at the request of the counsel for the defendant, to enable them to take full notes in their own way. Held to be a matter wholly within the discretion of the court, and that the court exercised its discretion properly.

The court restricted the counsel to four hours on each side for argument. Held that this did not violate the provision of the state constitution (Art. 1, sec. 9,) that "in all criminal prosecutions the accused shall have a right to be heard by himself and by counsel."

A limitation put upon the exercise of this constitutional right must be reasonable.

Remote and obscure allusions to an act in contemplation, made before the commission of a crime, are admissible against a person on trial for the crime, as tending to show an existing disposition or design.

The jury are to judge whether such allusions had an innocent meaning, or had reference to the crime.

The defendant was charged with the murder of his father. Held that a remark made by him, a few days before the homicide, after speaking of his father, that he did not know but he should kill some one in a week, was admissible against him as a threat and as showing a revengeful and murderous spirit.

The defendant offered evidence that his father was reported in the neighborhood to be at times insane. Held inadmissible. Insanity is a fact that can not be proved by reputation.

The State offered in evidence several letters written by the defendant to his wife. Held that they were not protected as confidential communications between husband and wife, but were admissible.

Communications between husband and wife are not privileged so as to prevent a third person who overhears them from testifying to them.

And it makes no difference that the communications are in writing.

The defendant, for the purpose of proving his own insanity, introduced evidence that his sister had been insane. The counsel for the State, against the defendant's objection, was allowed to enquire what caused her insanity, in order to show that it was not hereditary. Held to be no error.

The burden of proving insanity at the time of the commission of a crime, rests upon the accused; the State is not bound to show in the first instance that he was sane at the time.

A witness called by the State to show the sanity of the defendant testified that within one hour after the homicide he met the defendant and enquired of him what the amount was of certain money the witness had paid him, and that the defendant stated an amount which the witness on soon after examining an entry made in his account book found to be correct; but the witness could not now remember the amount, except that it was about $43. The defendant objected to the evidence unless the book was produced. Held that the book was of no consequence—the object not being to prove the account, but only the agreement of the book with the statement of the defendant, to which the witness could testify without the book as well as with it.

The witness promised to send for the book, but his examination was continued without it and the defendant's counsel did not again call for it during the trial. Held that they had tacitly waived their demand for it.

It is no error for the court, in sentencing a prisoner for murder, not to make a formal enquiry whether he has anything to say why sentence of death should not be pronounced against him.

If it were necessary that this be done, it would not affect the verdict, but only the sentence, and the prisoner could be re-sentenced.

The reasons for such a practice, when it became established under the common law, do not exist with us.

Whatever rights in this respect the defendant had were waived by his counsel, making no request for such an enquiry.

And were also waived by the filing of a motion in arrest of judgment, in which all the reasons against the judgment and sentence were set forth.

INDICTMENT for murder; tried to the jury in the Superior Court for Fairfield County, on the plea of not guilty, before *Sanford* and *Beardsley*, Js.

Before the trial commenced the court, under the authority of the statute, employed stenographers to take down the evidence to be given upon the trial, and directed them to furnish each morning during the trial at the opening of court, to the court and to the counsel on each side, a transcript of the testimony of the next preceding day; which was done throughout the trial. To this mode of proceeding the counsel for the defendant objected, claiming the right to occupy all the time necessary to enable them to write out in full all the evidence to be offered. The examination was not so rapid as to prevent counsel from taking sufficient minutes of the material parts of the testimony. In two or three instances, when the counsel for the defense asked that the witness might stop to enable them to take full minutes, the court in the exercise of its discretion declined to grant the request, deeming it unnecessary. To this the counsel for the defendant also excepted.

The persons who were summoned on the *venire* were severally produced and questioned by the attorneys for the state and for the defendant on their qualifications, but no oath was administered to any of them prior to such examination, nor was any other evidence regarding the qualifications of any of the jurors offered than their own oral statements and answers, given without the sanction of an oath; but no claim was made on behalf of the prisoner that an oath should be administered to the jurors on such examination.

One Brothwell, who was in attendance as a juror, on such examination stated that he had read an account of the homicide in a newspaper, and from such reading had formed an impression as to the guilt of the defendant, but had no decided opinion as to whether he was guilty or not, and that his mind was in such condition that he could try the case impartially; whereupon the defendant challenged him for favor, but the court overruled the challenge, and subsequently Brothwell was peremptorily challenged by the attorney for the State.

One Northrop, another juror in attendance, upon examination also stated that he had read in some paper some account of the homicide, and from such reading had formed rather an indefinite opinion in reference to the matter, and might have expressed the same, with the qualification, "if the report he had read was true," but further stated that he had formed no such opinion as would prevent his trying the case impartially; whereupon the defendant challenged him for favor, which challenge was overruled. He was then challenged peremptorily by the defendant.

One Slosson, summoned as a talesman, was also examined, and upon such examination stated that from reading some account of the homicide in a newspaper he had formed an opinion as to the guilt of the defendant, and might have stated what his opinion was, but that his mind was in such a condition that he could try the case impartially upon the evidence; he was then challenged for favor by the defendant, which challenge was overruled, and he was then peremptorily challenged by the defendant.

The State claimed the right to challenge peremptorily twenty jurors. The defendant objected to more than two peremptory challenges on the part of the State, but the court overruled the objection and allowed the claim of the State, and thereupon the State did challenge peremptorily seven jurors, all of which peremptory challenges were allowed by the court.

To prove malice towards the defendant's father, the person claimed by the State to have been murdered by him, the State

introduced the testimony of one Joyce, that in the month of May previous to the homicide, the defendant, while planting corn near the residence of Joyce, who was his brother-in-law, told him that he should not be there to gather it; that he should be in Kansas; and requested him to gather the corn and see to his family. To this evidence the defendant objected on the ground that it did not prove, nor conduce to prove, any malice towards the deceased; but the court over-ruled the objection and admitted the evidence. On cross-examination Joyce testified that he never heard the defendant make any threats toward the deceased.

To prove malice, the State also offered the evidence of one Beeman, that the defendant said to him about a week before the homicide, "I don't think I shall always be as poor a man as I am now." The witness said "What time do you settle the estate?" The defendant replied, "The old man is not dead yet, and he is liable to live ten years." The witness rejoined "Yes, of course." The defendant then said—"Folks talk about me—the neighbors. I will come home drunk some time and give them something else to talk about. I don't know but I shall be in Canada in a little less than a week; don't know but I shall kill some one in a week: that will give them something else to talk about." To this evidence the defendant objected, as not proving or conducing to prove malice against the deceased; but the court overruled the objection and admitted the evidence.

It appeared from the evidence in the case that at the time of this conversation and at the time of the homicide the defendant was residing with his wife and children at some distance from the house where his father was then staying.

In his defense, the prisoner claimed and offered evidence to prove that when he committed the homicide he was of unsound mind, and was wholly unconscious of what he was doing, and had no recollection of it whatever. In support of this defense, the defendant, after having introduced evidence that his father was a man of violent and eccentric habits and character, enquired of a witness whether his father was or was not reputed in the neighborhood where he dwelt to be

at times insane.     To this evidence the State objected, on the ground that insanity could not be proved by reputation, and the court rejected it.

The defendant did not call his wife as a witness, and she was not a witness on the trial.

The State offered sundry letters written by him to her, which the State claimed contained admissions inconsistent with the claim of the defendant as to his unconsciousness at the time of the homicide and as to his unsoundness of mind. To the introduction of any of these letters the defendant objected, on the ground that all the letters were confidential communications between husband and wife, and as such, she not being a witness in the case, could not be used in evidence against the husband.

It was not shown how the State obtained the letters, or any of them, or that they had ever been in the possession of the wife; but the court overruled the objection and admitted all the letters in evidence.

The defendant introduced evidence to prove that his sister was insane, and required watching and restraint to prevent her from doing mischief to others, and continued so for about six years from the commencement of her insanity until her death.     The State, on cross-examination, claimed the right to enquire of the witnesses and to prove what caused her insanity, and to show that it was not hereditary ; to which the defendant objected, on the ground that it raised a collateral issue and was irrelevant and immaterial; but the court overruled the objection, and admitted the questions and the evidence as to the cause of her insanity.

The State offered no witness-in-chief to testify as to the sanity of the defendant at the time he committed the homicide.

The defendant introduced evidence tending to show that his father and sister had both been of unsound mind, and also a witness to prove that the defendant himself was of unsound mind when he committed the homicide.     In rebuttal the State offered a witness who testified to facts tending to prove that the defendant was of sound mind at the time, to which

the defendant objected, on the ground that the burden rested on the State to prove that he was of sound mind when he committed the homicide, and that this testimony should have been offered in chief; but the court overruled the objection and received the testimony.

The State, for the purpose of proving the mental condition of the defendant at the time of the homicide, offered the evidence of one Thomas, who testified to a conversation with him within an hour or two after the homicide, in the course of which the defendant stated what amount had been received by him from Thomas, in the course of certain dealings between them, though he, Thomas, was then unable to state what the amount then stated by the defendant was; and Thomas further testified that shortly afterwards he looked at his account-book, and found that the amount so stated by the defendant was correct, according to his book. The counsel for the defendant objected to this evidence unless the book was produced; whereupon the witness said that he would send for the book, and then without further objection or any ruling by the court proceeded to testify that the account in his book consisted of several items, and that he thought the amount appearing on it to have been paid to the defendant was in the neighborhood of $43, but that he could not state accurately. No request for the production of the book was afterwards made by the defendant's counsel, and the objection to the evidence of Thomas was not further pressed.

The counsel for the defendant, before the arguments to the jury were begun, claimed to the court the right to argue to the court and jury as long as they should deem fit, without any restriction in point of time as to the length of argument.

The court directed that four hours for argument should be allotted to each side—the respective counsel to divide it between themselves as they should choose. The counsel for the defendant, who spoke first spoke on his behalf, argued for two hours and five minutes. He then asked the court if they should enforce the limitation. On being informed that the court would do so, he desisted from speaking, though protesting that he had the right to argue for the defendant

as long as he chose, and that he desired to speak longer. The counsel who closed the argument for the defense occupied but one hour and thirty minutes.

The jury rendered a verdict of guilty of murder in the first degree.

Immediately after the jury had announced their verdict by their foreman, and had kept silent in response to the inquiry of the clerk, "And so say you all ?" the defendant requested the court that the jury might be polled, which request the court refused.

Before passing sentence of death upon the defendant the court made no inquiry of him or his counsel if he or they had anything to say why sentence of death should not be pronounced against him. No objection was made to passing such sentence on the ground of such omission to inquire by the court.

The defendant thereupon filed a motion in arrest of judgment, on the ground that a juror had expressed an opinion of his guilt before the trial, and had denied it on examination; which the court overruled as untrue in fact. He also filed a bill of exceptions and a motion in error, covering the foregoing points, and also a motion for a new trial.

*W. F. Taylor* and *H. S. Sanford*, in support of the motions.

1. The court erred in refusing to allow the counsel for the accused to take full minutes of the testimony. In consequence of this refusal they were deprived of the means of properly and seasonably understanding and considering the evidence.

2. The jurors, when examined as to their competency, should have been sworn on their *voir dire*. In a capital case the accused certainly had a right to have all their statements made under oath, and although no claim of this kind was then made on his behalf, still his right to it could not be waived. *Cancemi* v. *The People*, 16 New York, 501; *Greenleaf* v. *The People*, 74 id., 277.

3. The court erred in overruling the challenge of Brothwell for favor. He had formed an opinion of the guilt of the accused, but was permitted to judge for himself whether he

could be impartial or not. Having formed an opinion that the accused was guilty, he could not be impartial. The same considerations apply to Northrop and Slosson. They had formed and publicly declared their opinion of the guilt of the accused; this opinion was an adverse one, which it required evidence to remove. They could not act fairly and impartially as jurors.

4. The act of 1879, allowing the State twenty peremptory challenges, was, as to the present case, *ex post facto*. It was passed not only after the homicide, but also after the finding of the indictment, and also after the former trial of the case. 1 Sharswood's Blackstone, 91, note 3; Potter's Dwarris on Statutes, 161, and cases there cited; Cooley's Const. Limitations, 63; *Sayre* v. *Wisner*, 8 Wend., 661.

5. The evidence of Joyce should have been rejected for the purpose for which it was offered. It did not prove or conduce to prove any malice against the deceased. On cross-examination he admitted that he never heard the accused make any threats against the deceased. The evidence of Beeman should have been rejected for the same reason; it neither proved nor conduced to prove malice toward the deceased.

6. The evidence that the father was reputed to be insane was improperly rejected. It is often difficult to prove such a fact by other means, and such a reputation in a neighborhood where a man lives is always founded upon fact.

7. The confidential letters of the accused to his wife were inadmissible. Such letters are always protected as privileged communications. 1 Greenl. Ev., §§ 254, 334.

8. The court erred in restricting the counsel for the accused in their time for argument. The right of trial by jury is a constitutional right; also his right to be heard by himself and by his counsel. When the constitution was formed no restriction was placed on this right. Not only are a prisoner's counsel to be heard as long as they desire, but he himself is also to be heard as long as he wishes. Practically there can hardly be any abuse of this right. Conn. Const., Art. I, sec. 9; *State* v. *Miller*, 75 N. Car., 73; *People* v.

*Keenan*, 13 Cal., 581; *Williams* v. *The State*, 60 Geo., 367; Moak's note to 22 Eng. R., 741, and cases there cited.

9. The evidence of the insanity of the accused's sister was clearly admissible; and the court should not have allowed evidence of the cause of her insanity, as this raised a collateral issue.

10. The evidence offered by the State in rebuttal, tending to prove the sanity of the accused at the time of the homicide, was improperly admitted. The murder must be proved by the State in all its elements; in its evidence in chief; and no part of its evidence could be reserved for rebuttal.

11. The court erred in refusing to have the jury polled, as particularly requested by the accused. By the common law he had a clear right to have them polled, and the practice in this state to the contrary ought not to conclude him. Even if others have not claimed that right, that should not deprive him of it. Proffatt on Jury Trials, 402; *Root* v. *Sherwood*, 6 Johns., 67; *Fox* v. *Smith*, 3 Cow., 23; *People* v. *Perkins*, 1 Wend., 91; *Labar* v. *Koplin*, 4 N. York, 546; *State* v. *Hughes*, 2 Ala., 102; *Brister* v. *The State*, 26 id., 131; *Waller* v. *The State*, 40 id., 325; *Cook* v. *The State*, 60 id., 39; *State* v. *Young*, 77 N. Car., 498; *Sargent* v. *The State*, 11 Ohio, 472; *Wright* v. *The State*, 11 Ind., 569; *Tilton* v. *The State*, 52 Geo., 478; *Nowell* v. *Devall*, 50 Misso., 272.

12. The omission of the court to make the formal inquiry of the accused why sentence of death should not be pronounced against him was a fatal error—just as fatal as to neglect to take any plea from the prisoner. If the record disclosed no plea made by the prisoner it is obvious this would be a fatal error. 2 Swift Dig., 417; 4 Bla. Com., 375; 2 Broom & Had. Com., 632, note *d; West* v. *The State*, 2 Zabr., 212; *Jones* v. *The State*, 51 Miss., 718; *State* v. *Ball*, 27 Misso., 324; *Crim* v. *The State*, 43 Ala., 53; *Mullen* v. *The State*, 45 id., 43; *Van Dyke* v. *Martin*, 55 Geo., 466.

*J. H. Olmstead*, State's attorney, contra.

LOOMIS, J. In order to abbreviate as much as possible the discussion of the numerous questions which the record presents for review, we will consider them under the following four general heads:—1st. Those relating to the jury. 2d. To the rights and privileges of counsel. 3d. To the admissibility of evidence. 4th. To the validity of the sentence.

First. The first question under the first head is, whether in showing the ground of challenge for cause, the oath on *voir dire* should have been administered to the jurors, though no request was made for that purpose by either party.

We can find no ground for a new trial here. As the defendant saw no occasion at the time to ask for it, it is too late now to complain. There is nothing which can more easily be waived than this matter of challenges to the favor. A party waives the whole matter simply by remaining silent. If while the panel is being made up he knows of a cause of challenge and does not take it, it is well settled that he cannot avail himself of the defect afterwards; and when he voluntarily inquires of a juror as to his bias and takes his statements without requiring the sanction of an oath, and goes to the court on the sufficiency of the facts so stated as a ground of challenge, he ought on every principle to be concluded by it.

It is a case where all parties assume and virtually agree that the statement as made is true. The court assumes the same thing and passes on the sufficiency of the statement, so that the defendant is in no wise prejudiced, unless he could under the sanction of an oath prove other or different facts. If he thought so, he should have asked the court to administer the oath.

But we do not even concede, except for purposes of argument, that the accused could have demanded the oath as matter of strict right. We do not think the common law practice has ever been adopted in this state, and our statutes are silent on this subject. By the strict common law mode the question goes before triers appointed for that purpose and the jurors cannot be inquired of whether they have expressed opinions adverse to the prisoner in order to found a challenge to the polls on that ground, but the facts must be proved by

State *v.* Hoyt.

extrinsic evidence. *The King* v. *Edmonds*, 4 Barn. & Ald., 476. The same rule still prevails in several of the United States. *Robinson* v. *The State*, 1 Kelly, 563; *Jones* v. *The State*, id., 610; *Respublica* v. *Dennie*, 4 Yeates, 267; *State* v. *Baldwin*, 1 Tread., 289; *State* v. *Simms*, 2 Bailey, 29.

It is undoubtedly the more common method in this country to show the ground of challenge by the oath on *voir dire*, and such is we think a natural, convenient and reasonable mode.

In this state the practice we believe has been unknown till within a very recent period, where on motion of the accused it has been permitted in a few capital trials. We think the matter may safely be left in the discretion of the court. It would doubtless be granted upon request in all cases of very grave importance.

The next question is, whether the challenges for cause were properly overruled in the cases of jurors Brothwell, Northrop and Slosson.

As to the first, the answer that he did not serve as juror at all, having been peremptorily challenged by the State, is sufficient. The accused could not possibly have been prejudiced by this ruling, as the number of jurors which he could challenge peremptorily remained the same. Even where the accused himself resorts to a peremptory challenge after challenge for cause is overruled, it has been held that he is not aggrieved where the impaneling of the jury was completed without exhausting the right of peremptory challenge. *State* v. *McQuaige*, 5 So. Car., 429; *Morton* v. *The State*, 1 Kan., 468; *McGowan* v. *The State*, 9 Yerger, 184; *Ferriday* v. *Selsen*, 4 How. (Miss.), 506; *Carroll* v. *The State*, 3 Humph., 315; *Mims* v. *The State*, 16 Ohio St., 221.

And in several of these cases it was dictinctly held that the record must show affirmatively that the right of peremptory challenge was so exhausted, in order to make the objection available to the accused. In the case at bar it appears that both Northrop and Slosson were challenged by the accused and did not sit as jurors, and the record fails to show that the right of peremptory challenge had been exhausted. So that

the principle laid down in the above authorities will dispose of all the cases.

But lest, as to the last two jurors, there may have been an omission in the record to state a fact that really existed in favor of the accused, we will consider briefly the merits of the question.

It is found that Northrop had read in some paper some account of the homicide, and from such reading formed rather an indefinite opinion in reference to the matter and might have expressed the same, qualifying it by adding, if the report he had read was true; but further stated that he had formed no such opinion as would prevent his trying the case impartially.

As the reading was limited to some account in a newspaper and the opinion formed from that was "indefinite" and purely hypothetical, and if ever expressed was so qualified, and the juror was clear that he could try the case impartially, it is manifest that the court properly overruled the challenge. The case is not only clearly within and controlled by those of *State* v. *Potter*, 18 Conn., 166, and *State* v. *Wilson*, 38 Conn., 126, but is within the principle of a great preponderance of authorities in other jurisdictions. *People* v. *Brown*, 48 Cal., 253; *Plummer* v. *The People*, 74 Ill., 361; *Thomas* v. *The People*, 67 N. York, 218; *Greenfield* v. *The People*, 20 N. Y. Supreme Ct., 242, *Heart* v. *The State*, 57 Ind., 102; *Gillooley* v. *The State*, 58 Ind., 182, *State* v. *Lartigue*, 29 Louis. Ann., 642; *Curley* v. *Commonwealth*, 84 Penn. St., 151; *State* v. *Tatro*, 50 Verm., 483.

The statement of the other juror, Slosson, was that, "from reading some account of the homicide in a newspaper, he had formed an opinion as to the guilt of the accused and might have stated what his opinion was, but that his mind was in such a condition that he could try the case impartially upon the evidence."

At first view this may not seem so clear as the case of Northrop, but when analyzed and more critically examined, the statement, with the natural and necessary inferences to be derived from it, will be found to have substantially the same

meaning. In both the reading was of the same character— simply "some account in a newspaper," and the opinion was formed entirely "from" such reading. Northrop, reasoning his own case, explained that his opinion was indefinite and hypothetical. But in Slosson's case the inference would seem to be a necessary one that his opinion also was based on the supposition that the account read was true; and he adds explicitly "that his condition of mind was such that he could try the case impartially upon the evidence," obviously meaning the evidence to be given in court, excluding the newspaper account.

In *State* v. *Wilson*, supra, the statements by the jurors Lonzo M. Smith and Samuel J. Mills, as to having formed and expressed an opinion, were at least as strong as, if not stronger than, in the present case. And the reasoning of BUTLER, C. J., in giving the opinion in that case, is fully applicable to the present case. Referring to opinions formed from newspaper accounts he says:—"Opinions thus formed are not in their nature such as should disqualify a juror. If he is free from partiality or prejudice derived from any other source, his opinion is, as a matter of course, hypothetical— not fixed or settled in the sense in which those terms are used, when used correctly, in the law. All men take news-paper statements as current news, liable to qualification, explanation or contradiction, and when qualified, explained or contradicted they change their opinions or belief accordingly, as matter of course. It requires no stronger evidence to satisfy the mind of a juror having such an opinion, impres-sion, supposition or belief, one way or the other, as the evidence may preponderate, than it would if he had never read the statement. His mind is certainly in no worse situa-tion than the mind of a juror who has heard one side in court making a primâ facie case, is to hear the defence when made upon the other side and give it its just weight."

The next question is whether the court erred in allowing the State to challenge peremptorily seven jurors.

Ever since the year 1848, the accused, in trials for murder, has been allowed twenty peremptory challenges. But, prior

to the act of 1879, (Session Laws, 1879, p. 363,) the State was allowed only two. But the act of 1879, which was in force at the time of the trial, provided that "upon the trial of any criminal prosecution the State may challenge peremptorily as many jurors as the accused is allowed by law to challenge peremptorily in such case."

The ruling of the court therefore was clearly authorized by the last-mentioned statute; and the only question is whether the act was constitutional and valid as applicable to this case. The offense is alleged to have been committed June 23d, 1878, prior to the passage of the act in question. The claim in behalf of the accused is that the statute was *ex post facto*, and that therefore it could not be applied to this case.

But the legal meaning of *ex post facto* is not its literal meaning. It has a technical signification. In the leading case of *Calder* v. *Bull*, 3 Dall., 390, four classes of statutes are mentioned as within the intent and meaning of the constitutional prohibition in question, namely: 1st, laws that make an act, which was innocent when done, criminal, and punish it as such; 2d, that aggravate the crime and make it greater than it was when committed; 3d, that inflict greater punishment than the law did when the crime was committed; 4th, that alter the legal rules of evidence so as to require less or different testimony in order to convict the offender than was required when the crime was committed.

The statute we are now considering has none of the elements of an *ex post facto* law, but relates exclusively to the mode of procedure, which is and must at all times be under the control of the legislature. Judge Cooley, in his Treatise on Constitutional Limitations (4th ed., p. 331), well says: "So far as mere modes of procedure are concerned, a party has no more right in a criminal than in a civil action to insist that his case shall be disposed of under the law in force when the act to be investigated is charged to have taken place." The precise question under discussion has been repeatedly decided adversely to the defendant's claim.

In the following cases it is held that statutes giving the government additional challenges are valid, though passed

after the crime was committed: *Stokes* v. *The People*, 53 N. York, 164; *Walston* v. *The Commonwealth*, 16 B. Monr., 15; *Commonwealth* v. *Dorsey*, 103 Mass., 412; *Jones* v. *The State*, 1 Kelly, 610; *Warren* v. *The Commonwealth*, 37 Penn. St., 45; *State* v. *Ryan*, 13 Minn., 370; *State* v. *Wilson*, 48 N. Hamp., 398; and in *Dowling* v. *The State*, 5 Sm. & Marsh., 664, it was held that a statute reducing the number of the prisoner's peremptory challenges was valid.

The remaining question under the first head is, whether the accused, at his request, had the right to have the jury polled.

Such a right, under the law and practice of this state, has never been recognized, and there are no considerations of justice, expediency, or security to the prisoner, that require its adoption instead of our present practice.  Our practice is in effect but obtaining in a more convenient way the opinion of each individual juror.  The established form of procedure, as given in 2 Swift's Digest, p. 439, is as follows : When the jury announce that they have agreed on a verdict, they are distinctly asked, " Who shall speak for you ? "  The reply is, " The foreman."  The foreman makes answer for the jury; the clerk is directed to record the verdict; the jury are again distinctly asked to hearken to their verdict, and it is again repeated, the clerk adding, " So say you all."

Under such a practice there can be no propriety in having the jury polled.  But it is claimed as a common-law right. It is, however, doubtful whether at common law it was considered an absolute right.  Lord Hale states (2 Hale's P. C., 299,) that when the jury say they have agreed, " the court may examine by poll," which implies that it was within the discretion of the court.

In the United States the decisions in different states are conflicting.

In *Ropps* v. *Barker*, 4 Pick., 239, it was held to be not the right of the party to have the jury polled ; that when the jury have openly, deliberately and unanimously assented to the verdict when called on for that purpose, it afforded all the evidence of unanimity which could reasonably be required.

This decision has since been followed and applied to capital trials in *Commonwealth* v. *Roby*, 12 Pick., 496, and *Commonwealth* v. *Costley*, 118 Mass., 1. A similar decision in a capital cause was also made in *State* v. *Wise & Johnson*, 7 Richardson, 420.

We conclude this discussion by adopting the language of Mellen, C. J., in giving his opinion in *Fellow's case*, 5 Greenl., 333 : " As to the exception " (that the jury were not polled) " it certainly cannot be sustained for a moment. The course of proceeding on the part of the court was according to uniform immemorial usage." * * " It is of no consequence whether the question proposed by the clerk to the jury, as to their affirmation of their verdict, be directed to them jointly or separately ; in either case all are called on by way of inquiry, whether in open court they consent to the verdict, signed or announced *ore tenus* by their foreman. If no one objects, all are considered by their silence as expressing their consent."

*Second.* We come now to consider certain rights and privileges claimed by counsel for the accused during the trial, and which were claimed to have been violated by the rulings of the court in limiting the time they desired for taking notes of testimony and for argument.

The court, under a recent statute and at large expense to the state, employed stenographers to take the testimony in full, and directed that full copies of the testimony taken each day be delivered to the counsel for the accused on the morning of the day succeeding, which was complied with. Under this arrangement it is found that in two or three instances the court declined to stop a witness at the request of the counsel for the accused, to enable them to take full notes in their own way and time.

This was a matter fully within the discretion of the court, and is not subject to review here ; but the question in a sense, being here, we will avail ourselves of the opportunity to say that the ruling meets our most emphatic approval. And we will add that the exercise of a similar wise discretion in trials generally, whether civil or criminal, and whether with or

without stenographers, would greatly expedite the transaction of judicial business, without any detriment to the administration of justice.

Another complaint is, that the court restricted the counsel to four hours for the argument.

The statute (General Statutes, p. 61, sec. 9) providing that " in no trial before the Superior Court * * shall counsel occupy more than one hour in argument, unless the court shall, on motion for special cause before the commencement of such argument, allow a longer time," is broad enough in its language to include criminal as well as civil proceedings. And if it is to be so construed, it implies that the legislature considered that the constitutional right to be heard by counsel was subject to regulation and limitation. The present question, however, is not controlled by the construction of the statute, but rather by the meaning of the constitutional provision.

The court did not restrict the argument to the hour mentioned in the statute, but extended it to four hours. There is no claim or suggestion that the time so allowed was insufficient for the purposes of a full, fair and complete defense. On the contrary the fact that the counsel did not occupy the time they had, but fell short twenty-five minutes, is satisfactory evidence that the accused was not aggrieved by the limitation.

The sole question therefore is, whether the court had the right to limit the time at all. The counsel for the accused contend that the constitution, Art. 1, sect. 9, guarantees the right of an unlimited time for argument. The language is, that " in all criminal prosecutions the accused shall have a right to be heard by himself and by counsel."

The right so guaranteed is of inestimable value, not alone to the accused, to prevent any perversion of law or fact affecting his life, liberty or property, but to the court and the cause of incorruptible justice as well. We would not therefore abridge by one jot or tittle so precious a privilege. But what is the fair meaning of the guarantee? Is the right to be heard by counsel to be understood as having no limitations

whatever? Surely not as to the number of counsel who may speak; why then as to the time they may occupy? The very purposes for which courts of justice were instituted would be or might be defeated if such privileges were subject to no restriction. The limitations of course must be reasonable, such as do not essentially impair the right or deny a full and complete defense.

As the accused in the present case had the opportunity of being reasonably and fully heard by counsel, we conclude that the constitutional guarantee referred to was in no wise infringed. And this view is fully confirmed by the decisions generally of the courts of the other states under similar constitutional provisions.

In *Weaver* v. *The State*, 24 Ohio St., 584, the action of the court below in limiting the time for argument on the trial of a person indicted for an assault with intent to kill was sustained. White, J., in giving the opinion of the court, said: "The constitution of Ohio guarantees to the accused the right to 'appear and defend in person and with counsel.' But this guaranty is not inconsistent with the existence of power in the court to regulate the exercise of the right by reasonable rules and limitations. Courts are established for the purpose of administering justice. To insure the accomplishment of this object and prevent abuse, it is essential that courts should exercise a superintending control over the argument of causes before them. The power it is true may be abused, and if it should be it would constitute ground for a new trial. The exercise of the power against a party charged with a grave criminal offense is certainly a matter of delicacy and should be governed by prudence and caution. Full time should be allowed for the fair discussion and presentation of the case."

In *Lee* v. *The State*, 51 Miss., 566, being a prosecution for theft, the time limited was thirty minutes, which was held no ground for a new trial. The court said:—"The rule was not applied arbitrarily, tyranically, without just reason, in a spirit of partiality and prejudice. It cannot be said that the accused was not heard by himself and counsel, or both. A case might arise calling for the action of the court. There

is nothing in the record upon which this court can assume that the plaintiff in error was injured or prejudiced by the restriction imposed upon his counsel."

The case of *State* v. *Linney*, 52 Missouri, 40, was an indictment for murder. Wagner, J., in giving the opinion said:— "The court limited the time of the accused in addressing the jury and it is argued that there was no right to place any restriction upon him. The question was formerly raised and decided by this court in favor of the ruling complained of, and we are not disposed to review the subject. Moreover it does not appear that the counsel in this case did not have sufficient time. The power to limit and restrict the time might be abused, and a case might be presented in which the court would feel itself called upon to interfere."

In *State* v. *Collins & Blalock*, 70 N. Car., 307, the right to limit the time was held to be in the sound discretion of the court. Subsequently to this decision however a statute was passed, which in express terms gave the counsel the right to address the court or jury "for such a space of time as in his opinion might be necessary for the proper development and presentation of his case."

There are many instances also in which the courts have not approved of the restriction because under the particular circumstances it was unreasonable. In *People* v. *Keenan*, 13 Cal., 581, the defendant's counsel in a trial for murder, where the testimony was all circumstantial and very voluminous, was restricted to one hour and a half, and a new trial was granted on the ground that the time was not sufficient for a full and fair discussion. The court said:—"We do not question the right of a district judge to limit counsel to a reasonable time in their arguments to the jury, though from the danger to which this power is exposed it is perhaps better, if ever done at all in capital cases, that it should be done in very extraordinary and peculiar instances." The same principle is recognized in the cases of *Hunt* v. *The State*, 49 Geo., 255, *Word* v. *The Commonwealth*, 3 Leigh, 743, *Lynch* v. *The State*, 9 Ind., 541, and *People* v. *Toch Chew*, 6 Cal., 636.

*Third.* The next question is, whether the rulings of the court were correct, relative to the admissibility of testimony in the several instances mentioned in the motion.

The court allowed one Joyce to testify that, in the month of May previous to the homicide, the accused, while planting corn near the residence of the witness, who was his brother-in-law, told him that he should not be there to gather it; that he should be in Kansas; and requested him to gather the corn and see to his family. We think this evidence was properly permitted to go to the jury as tending in some degree, especially in connection with other evidence, to show the prisoner's state of mind during the month previous to the homicide. The fact that the language might possibly have an innocent meaning did not prevent its consideration by the jury, who would of course be called upon to decide whether such was the fact, or whether it was a dark hint thrown from a mind that already felt the shadow of the coming tragedy. If the former was the true interpretation, the language would go for nothing and could not possibly prejudice the accused. If the latter, it was clearly admissible as within well established principles.

Remote and obscure allusions to the act in contemplation are admissible as tending to show an existing disposition or design. Burrill, in his valuable Treatise on Circumstantial Evidence, pages 332, 333, in speaking of such verbal expressions, says:—"In these expressions, slight as they may appear, the criminal takes a very material step forward in his career; material both as to its consummation by himself and its future detection and punishment by the law." * * "They are sometimes managed with great art; they are thrown out voluntarily and purposely, it is true, but in so obscure and intangible a form as to amount to nothing more than mere general intimations. They are in fact parts of a system of *preparation*, but of the most preliminary kind, intended to explore the way for more direct action in the future. The criminal ventures no farther than to hint at or obscurely allude to the act he has in contemplation. He proceeds warily, throwing out feelers as it were in advance,

partly to sound the temper of those among whom he trusts himself, and partly to give an air of probability to the approaching event, and yet to disconnect himself from all apparent agency in producing it."

One Alfred Beeman was permitted, against the defendant's objection, to testify that the defendant said to him about a week before the homicide, "I don't think I shall always be as poor a man as I am now." And to the witness's inquiry "What time do you settle the estate?" he replied—"The old man is not dead yet, and he is liable to live ten years." The witness said—"Yes, of course." The defendant then said— "Folks talk about me—the neighbors. I will come home drunk some time and give them something else to talk about." He also said—"I don't know but I shall be in Canada in a little less than a week; don't know but I shall kill some one in a week; that will give them something else to talk about."

This testimony was admissible upon the same principles we applied to that of Joyce, only it is much more significant and important, and rises to the character of a threat, which, from the conversation about the father and his estate, the jury would have the right to construe as aimed at the father. It showed most clearly the revengeful and murderous passions that were taking possession of the mind of the accused. In *Hopkins* v. *The Commonwealth*, 50 Penn. St., 9, it was held that "threats made by a prisoner within an hour before the commission of the murder that he would kill somebody before twenty-four hours, were evidence of malice prepense, though they did not expressly refer to the deceased; and that if he killed anybody in pursuance of such malice it was murder in the first degree."

The evidence offered by the accused that "his father was reputed in the neighborhood where he dwelt to be at times insane," was properly rejected by the court.

Insanity is a fact that cannot be proved by reputation. *Ashcroft* v. *De Armond*, 44 Iowa, 229; *Foster* v. *Brooks*, 6 Geo., 287; *Choice* v. *The State*, 31 Geo., 424.

It seems to us impossible to suggest a more objectionable instance of hearsay evidence than this, being in effect the

mere opinions of persons out of court as to another's insanity, not only without the sanction of an oath and the test of cross-examination, but without even the facts on which the opinions were based, which would be indispensable in the case of a non-expert who should give his opinion under oath in court.

The State having possession of several letters written by the defendant to his wife, (how obtained or whether they were ever in the wife's possession did not appear,) offered them in evidence as containing admissions inconsistent with the testimony of the accused given in court and with his claim as to unsoundness of mind. They were objected to by the accused on the ground that they were confidential communications between husband and wife, but the court admitted the evidence.

In this ruling the court violated no rule of evidence. The question was not whether the husband or wife could have been compelled to produce this evidence, but whether, when the letters fell into the hands of a third person, the sacred shield of privilege went with them. We think not. 1 Greenl. Ev., § 254*a*. The fact that the communications in this case were written places them on no higher ground than if they were merely oral. And as to the latter, it is well settled that conversations between husband and wife are not privileged so as to prevent a third person who overheard them from testifying. 1 Bishop's Crim. Proc., § 1155. In *State* v. *Centre*, 35 Verm., 378, it was decided that a conversation between the prisoner, a married woman, and her husband, tending to show an admission of her guilt to him, and overheard by a witness in an adjoining room, was not such a confidential communication as the law excludes as evidence. And in *Commonwealth* v. *Griffin*, 110 Mass., 181, on trial of an indictment for manslaughter, it was held that a private conversation between husband and wife, who thought no one overheard them, may be testified to by a concealed listener. See also *Hendrickson* v. *The People*, 1 Parker's C. C., 406 ; *Rex* v. *Simons*, 6 Car. & P., 832.

The motion further shows that the accused introduced evidence to prove that his sister had been insane about six

State v. Hoyt.

years, and complaint is made because the court permitted the prosecutor on cross-examination to inquire what caused such insanity, in order to show that it was not hereditary. This is no ground for a new trial.

Obviously one of several children might be insane from many causes that could not possibly affect the others. If therefore the testimony in chief was relevant at all (which is doubtful,) there is no possible ground for its admissibility unless it tended to show a taint of insanity descending with the parental blood. So that the cross-examination was strictly legitimate as calculated to furnish an instant and perfect test of the value of the testimony.

Again, the accused having introduced evidence tending to show that he was of unsound mind when he committed the homicide, the court permitted the State in rebuttal to offer evidence to prove that the defendant was of sound mind at the time in question. To this the accused objected, on the ground that the burden rested on the State to prove that the defendant was of sound mind when he committed the homicide and that the testimony should have been offered in chief.

This precise point was made by the accused when his case was previously before this court and was decided adversely to his claim. *State* v. *Hoyt*, 46 Conn., 331. This ought to be satisfactory, especially when all the authorities accord with that decision. *Commonwealth* v. *Eddy*, 7 Gray, 583; *Commonwealth* v. *Heath*, 11 Gray, 303; *State* v. *McCoy*, 34 Miss., 531; *United States* v. *McGlue*, 1 Curt., 1; *People* v. *Robinson*, 1 Park. Cr. C., 649; *Walter* v. *The People*, 32 N. York, 147; *State* v. *Starling*, 6 Jones Law (N. C.), 366; *Loeffner* v. *The State*, 10 Ohio St., 598; *People* v. *Garbutt*, 17 Mich., 9; *Fisher* v. *The People*, 23 Ill., 283; *State* v. *Klinger*, 43 Misso., 127.

The only remaining question of evidence relates to the testimony of one Thomas, a witness offered by the State to prove the mental condition of the accused, and who testified that within an hour or two after the homicide the accused stated what amount had been received by him from the witness, who soon after referred to his book and found the

amount stated correct. The counsel for the accused objected unless the book should be produced, whereupon the witness said that he would send for it, and then, without further objection or any ruling by the court, proceeded to testify that the account consisted of several items, that he thought the amount was about forty-three dollars, but could not state it accurately. It did not appear whether or not the book was sent for, but the motion says that "no request for the production of the book was afterwards made by the counsel for the accused, and the objection to the evidence of Thomas was not further pressed."

It is clear that this furnishes no ground for a new trial. There was no objection to the evidence itself, but only to the evidence without the book. When the witness promised to send for the book the counsel for the accused were satisfied, and without asking for or obtaining the ruling of the court allowed the witness to proceed. And as the witness stated that he could not then recollect the amount named by the accused nor the amount he found upon the book, only that they were the same, the book was of no importance to the accused in testing the recollection of the witness nor in a cross-examination, nor indeed in any aspect of the case. The object was not to exhibit or prove an account. The force of the testimony consisted exclusively in the fact that near the time of the homicide, when the accused claimed to be unconscious, he showed such accuracy of memory. The witness himself had verified this accuracy by reference at the time to his book. The fact of such verification he was able to state, but could give in court no details or data to enable the jury to verify it themselves. The reason therefore why "the production of the book was not demanded and the objection was not further pressed," is manifest. We consider the demand for the book tacitly waived, and that the accused was not aggrieved by its non-production.

*Fourth.* The last general topic for our discussion relates to the validity of the sentence. The precise question for review is, whether the omission of the court to make formal inquiry of the accused if he had anything to say why sentence

of death should not be pronounced against him, furnishes sufficient ground for a new trial, or is a fatal defect in the judgment?

Upon principle it can be no ground for a new trial. There was no mis-trial. The error (if any) did not enter into or in any manner affect the verdict. It did not issue out of it, but was entirely independent, and occurred after the rendition and recording of the verdict. So that the verdict must stand; and if the judgment should be arrested or set aside, the case should go back to the Superior Court to be proceeded with from the point where the error intervened, that is, the court would be called upon to make the inquiry referred to, and then pronounce sentence again. This course is not only dictated by principle, but is in accordance with the preponderance of authority. 1 Bishop's Crim. Proc., § 1293; *State v. Johnson,* 67 N. Car., 59; *State v. Jacocks,* 5 Jones Law, 259; *Keech v. The State,* 15 Florida, 591; *Kinsler v. Wyoming Territory,* 1 Wy. Ter. R., 112.

But was the omission referred to fatal to the validity of the sentence?

It is conceded that it would have been so under the common law and practice in England. The rule there is stated in 1 Chitty's Crim. Law, 700, as follows:—" It is now indispensably necessary, even in clergyable felonies, that the defendant should be asked by the clerk if he has anything to say why judgment of death should not be pronounced on him; and it is material that this appear upon the record to have been done." * * " On this occasion he may allege any ground in arrest of judgment, or plead a pardon, if he has obtained one, for it will still have the same consequences which it would have produced before conviction, the stopping of the attainder. If he has nothing to urge in bar, he frequently addresses the court in mitigation of his conduct, and desires their intercession with the king, or casts himself upon their mercy."

In this connection it is also to be considered that anciently in England a person on trial for a felony was not allowed counsel. The presiding judge in theory was his counsel, but

did not represent the accused in the sense that counsel do with us. If therefore the judge omitted anything which was the right or privilege of the accused, it was considered the act of the court, which could in no wise prejudice the prisoner, and the rights of the latter could not be waived as may now be done.

If we compare the rules and practice that obtained in England with our own it will readily be suggested that the reasons that made the inquiry of the prisoner so essential do not apply at all in this state. Here the accused has always had counsel to represent him, vigilant to guard every right and claim every privilege deemed essential to his deliverance. The counsel well know that the verdict does not conclude the prisoner—they know all the remedies for ulterior relief and when and how they must be instituted. They are present when the prisoner, on motion of the Attorney for the State, is set at the bar to receive his sentence. They know that the court is open to hear any request, motion or objection, and that if the accused desires to say anything the court will grant him the privilege if he or they should so indicate.

Under our practice what possible harm can be occasioned to the prisoner by such an omission on the part of the court? He can have no pardon to plead, for that can only come from the legislature after sentence, no attainder to save, no benefit of clergy to pray for.

If he should say anything suggesting ground for some relief, his saying it would not be the remedy; it would have to take on some other legal form and be filed within the time prescribed. If he should in a capital case urge mitigating circumstances and put himself on the mercy of the court, it would avail nothing, because the court would have no discretion to exercise in regard to the punishment. If, as suggested in the argument, a possible utility of such inquiry might be to discover the prisoner's condition of mind as to sanity, we reply, not only that it would have no adaptation to such a purpose, but if it had there is no need of any such expedient under our law, which humanely allows a full year to intervene between the date of the judgment and its execution—afford-

ing most ample opportunity for such discovery or for any relief from the consequences of the conviction to which he may be entitled.

In this state as to all crimes below that of murder the common law rule has never been observed in practice. In capital cases it has been observed as a formality befitting the gravity and solemnity of the occasion, but not so essential to the validity of the proceedings as to be made a necessary part of the record as is required in other jurisdictions. Judge Swift, in the second volume of his Digest, p. 417, says expressly of the inquiry referred to:—"This is rather matter of form, as all legal means of defence have been previously exhausted." And as matter of form it may easily be waived, and was waived in the present case.

If counsel were present and no request was made of the court to be heard, and no objection was made to being sentenced without being heard, we think it would amount to a waiver of this formality. But in this instance there was a waiver of the most decisive character, even if we should regard the inquiry as one of the prisoner's rights.

The only purpose of making the inquiry is, that the prisoner may know that the verdict does not conclude him; that he may do something or say something to arrest the judgment. If he actually did move in arrest of judgment it is surely enough. The record in this case shows that the accused made a formal motion in arrest of judgment based on allegations of fact, and that the court made full inquiry into the truth of the allegations and finding them untrue overruled the motion. He might also have moved in arrest at the same time because the inquiry referred to was omitted; but he did not, because the other matter was all he had to say why sentence should not be pronounced. But he did say a good deal more in regard to the trial. He filed an elaborate motion for a new trial, embracing the sixteen distinct points we have considered; also a bill of exceptions containing the same specifications, (which we ought to say in passing was, as to all matters for which a new trial would lie, in defiance

of a rule of this court; Rules of Practice, Chapter 4, sect. 1;) also a motion in error based on the bill of exceptions.

After all this it would seem a most absurd, frivolous and idle ceremony for this court to set aside the judgment and remand the case to the Superior Court, to the end that the accused may be asked "whether he has anything further to say."

We are happy to observe that some of the courts in the United States are beginning to look upon this ancient requirement as a formality, the omission of which will not always invalidate the judgment. *State* v. *Johnson*, 67 N. Car., 59; *Grady* v. *The State*, 11 Geo., 253; *Sarah* v. *The State*, 23 Geo., 576; *State* v. *Ball*, 27 Misso., 324; *Jeffries* v. *The Commonwealth*, 12 Allen, 145; 1 Bish. Crim. Proc., § 1358.

There was no error in the judgment complained of, and a new trial is not advised.

In this opinion the other judges concurred.