Brown v. State.                    *62 N. J. L.*

JAMES K. BROWN, PLAINTIFF IN ERROR, v. THE STATE OF NEW JERSEY, DEFENDANT IN ERROR.

Argued November 28, 1898—Decided May 6, 1899.

1. An indictment in the statutory form, that the defendant did willfully, feloniously and with malice aforethought kill and murder the deceased, is a sufficient indictment where the killing is of a police officer. It is not necessary that the indictment should contain the allegation that the deceased was a police officer.

2. Before Magna Charta trial by jury was a trial before a tribunal established for the determination of matters of fact, consisting of twelve men, whose decision could only be by the consent of all.

3. Consequently, when by Magna Charta it was "granted  *  *  *  that no freeman shall be taken or imprisoned  *  *  *  nor in anywise damaged  *  *  *  except by the judgment of his peers or by the law of the land," trial by jury as previously known to the law was comprised in the phrase "by the judgment of his peers or by the law of the land."

4. The qualification of jurors and the means by which they were to be selected and empaneled constituted no part of the essential features of trial by jury at common law. Those matters were committed to the jurisdiction of parliament.

5. At common law the accused had his challenges touching the partiality of jurors without limit; hence it became the common law that the accused had the right to a trial by a common law jury, and by an impartial jury as at common law.

6. Where the constitution provides that the right of trial by jury shall remain confirmed as part of the law of the land, or the right of trial by jury shall remain inviolate, the words "trial by jury" import a trial by a jury of twelve men impartially selected, who must unanimously concur in their verdict. Consequently, an act diminishing the number of a jury or altering any of its essential features, as, for instance, dispensing with unanimity or depriving a party of challenges for cause—the purpose of which is to exclude jurors who are not impartial—would be unconstitutional.

7. The provisions in our constitution that "the right of trial by jury shall remain inviolate," and that "in all criminal prosecutions the

accused shall have a right to a speedy and public trial by an impartial jury," secure to the accused a right of trial by an impartial jury. The means by which an impartial jury shall be obtained are not defined. In neither of these constitutional provisions is there any requirement with respect to challenges or the mode in which the jury shall be selected. These subjects were left in the discretion of the legislature with no restriction or limitation, except that the accused should have the right to be tried by an impartial jury.

8. The subject of peremptory challenges has always been under legislative ·control, and the legislature has the power to increase or. diminish the number of peremptory challenges to be allowed to the state or the accused in criminal cases.

9. By the common law the accused was entitled to thirty-five peremptory challenges. By 22 *Hen. VIII., c.* 14, the number of peremptory challenges allowed to the accused on a trial for petit treason, murder or felony was reduced to twenty. By an act of the legislature passed in 1795, every person indicted for treason, murder or other crimes punishable with death (or for certain other enumerated high crimes), was allowed to challenge peremptorily twenty of the jurors. By an act passed in 1898 (*Pamph. L.*, *p*, 895, § 76), the court or a judge thereof, on the application of the state or of the accused, may order a trial by a struck jury. It provides for a list of ninety-six names selected by the judge, from which the state and the accused each is permitted to strike twenty-four. The forty-eight names that remain are returned as the panel from which the jury of twelve men is to be selected. The list of the jurors is to be furnished to the accused at least twelve days before the empaneling of the jury. At the trial the accused and the state each is allowed five peremptory challenges as the names are drawn from the box. The act does not restrict the common law right of challenging for cause. This act applies to the trial of criminal cases of every grade. *Held*, on the trial of an indictment for murder, that this statute did not violate the constitutional guarantee that trial by jury should remain inviolate, nor the constitutional guarantee of trial by an impartial jury.

10. The statute provides that a rule for a struck jury remains in force until the cause is tried. That some of the jurors were returned not found, some were excused and others unable to attend, will not entitle the accused to a common jury.

11. During the calling of the jurors to form a jury, two of the jurors summoned were excused by the consent of counsel and seven of the jurors were permitted to stand aside by the consent of counsel. When eleven jurors had been secured the panel was exhausted, and the court directed the names of those who had been permitted to stand aside to be again put in the box. The twelfth juror was obtained from the jurors whose names were put back in the box. *Held*, no error.

12. At common law a peace officer has a right to arrest without warrant

one whom he suspects to be guilty of felony, although it afterwards appears that no felony was committed, provided he has reasonable cause to suspect that the person arrested has committed a felony.

13. The distinction between felonies and misdemeanors is not observed in our criminal code. Statutory offences, if designated at all, are called "misdemeanors" or "high misdemeanors." The grade of the offence in our criminal code is determined by the character and degree of the punishment prescribed rather than upon the common law classification of felonies and misdemeanors.

14. A person may be arrested by an officer acting in good faith without a warrant, who has created facts and circumstances giving the officer reasonable cause to suspect him of being guilty of any such offence, and killing the officer in resisting such arrest or in attempting to escape therefrom is murder, though no such offence was in fact committed.

15. On the trial of an indictment for murder, where the justification is self-defence, an instruction to the jury that the burden is on the accused of proving to the satisfaction of the jury a situation and circumstances under which the right of self-defence might be lawfully exercised, and that before his defence is complete those facts and circumstances must appear to bring the act done by the accused within the prescribed limits—*Held*, to be correct, the judge having instructed the jury that the benefit of the reasonable doubt always goes to the defendant and is always applied in his favor.

16. An instruction that "the foundation of the right to take life by the way of self-defence is necessity. There must exist a necessity for resorting to violence for self-protection and necessity for using the means that were used to secure the defence of the person. An accused is justified in using force to defend his person only when force is necessary to accomplish that end. If the injury apprehended could be otherwise avoided the prisoner was bound to avoid the danger without resorting to violence, and even if the circumstances be such as to require the use of force to repel the assault, he will be inexcusable if he carried his defence beyond the bounds of necessity. The danger must be immediate and must be actual or else apprehended on reasonable grounds, of which the jury is to judge. The accused could not make his judgment of the necessity of slaying the deceased, in order to defend himself, a justification of his act. Whether the necessity for taking life existed must be determined from the situation of the accused at the time, and it is the province and duty of the jury to determine that question"—*Held*, correct.

17. Where the contention is that the act of killing would warrant a conviction for manslaughter only, an instruction by the trial court that the killing being established the presumption is that it was murder of the second degree, and if the defendant desires to reduce it to a lower degree of homicide he must establish that to the satisfaction of the jury—*Held*, correct.

18. To mitigate the offence to manslaughter on the ground that the fatal blow was given in a sudden transport of passion or heat of blood and upon reasonable provocation, the accused must make out the circumstances of alleviation to the satisfaction of the jury, unless they arise out of the evidence produced against him, as the presumption of law is that all homicides are malicious until the contrary is proved.

19. An instruction that to mitigate the offence to manslaughter the facts must show that the killing resulted from passion or heat of blood upon a reasonable provocation; the provocation must be of such a character and so close upon the act of killing that for the moment the accused could be considered as not master of his own understanding. If such an interval of time elapses between the provocation and the act of killing as is reasonably sufficient for reason to resume its sway it is not mitigated to manslaughter—*Held,* to be correct.

20. The trial court, having instructed the jury upon the effect of reasonable doubt in language comprehending every issue in the case, was not obliged to reiterate and apply it specifically to every such issue.

On error to the Hudson Oyer and Terminer.

For the plaintiff in error, *William D. Daly* and *Thomas F. Noonan.*

For the defendant in error, *James S. Erwin,* prosecutor of the pleas.

The opinion of the court was delivered by

DEPUE, J.   The plaintiff in error was indicted for the murder of Charles Gebhardt, a police officer of the city of Hoboken.   The indictment was found in the Court of Oyer and Terminer of the county of Hudson.   It contained two counts—first, the statutory form prescribed by section 45 of the act regulating proceedings in criminal cases.   *Rev., p.* 275 ; *Pamph. L.* 1898, *p.* 866, § 36.   The second count is in the common law form, charging the killing to have been done " willfully, unlawfully, feloniously, deliberately, premeditatedly and with malice aforethought."   The contention is that in order to charge the act of killing for which the accused was put on trial the allegation should have been of the killing of a police officer.   This contention is without substance.   An indictment in the statutory language that the

defendant did "willfully, feloniously and with malice afore-thought kill and murder the deceased" is sufficient.   *Graves* v. *State*, 16 *Vroom* 203; *S. C., Id.* 347; *Titus* v. *State*, 20 *Id.* 36.   At common law and independently of our statute, an indictment for killing an officer might well be in form general, that the prisoner *felonicè, voluntarie et ex malitiâ fuâ præcogitatâ*, &c., without alleging any special matter.   *Mac-kalley's Case*, 9 *Co.* 65, 68.

The accused was tried by a struck jury and was convicted of murder of the first degree.   The statute under which the jury in this case was struck confers on the Supreme Court, Court of Oyer and Terminer and Court of Quarter Sessions, or on any judge thereof, on motion on behalf of the state or the defendant in any indictment, power to order a jury to be struck for the trial thereof, and provides that upon making such order the jury shall be struck, served and returned in the same manner as in the case of struck juries ordered in the trial of civil cases except as by the act provided.   *Pamph. L.* 1898, § 75.   The order for a struck jury in this instance was made by the court on the application of the prosecutor.

The method in which the jury is struck in civil cases is substantially the same as the method of striking juries in England.   The party applying for such struck jury is required to give six days' previous notice to the adverse party or his attorney, and to the judge, sheriff or other officer, of the time and place of striking such jury, at which time and place the judge shall in the presence of the parties or their agents or attorneys, or such of them as shall attend for that purpose, select and transcribe the names of forty-eight persons so qualified, with their places of abode, "as he shall think most impartial and indifferent between the parties, and best qualified as to talents, knowledge, integrity, firmness and in-dependence of sentiment, to try the said cause;" and there-upon the party applying for such jury, his agent or attorney, shall first strike out one of the said names, and then the adverse party, his agent or attorney, shall strike out another, and so on alternately, until each shall have stricken out twelve;

but if the adverse party shall not attend such striking, nor
any person in his behalf, then the judge shall strike for him;
and when each shall have struck out twelve, as aforesaid, the
remaining twenty-four shall be the jury to be returned to try
the said cause, which list shall be delivered to the sheriff or
other officer who ought to summon such jury, together with
the *venire facias*, by the person applying for such jury, &c.,
at least ten days prior to the day appointed for the trial of
said cause; and such sheriff or other officer shall thereupon
annex the said list to the said *venire facias* and return the
same as the panel of the jury to try the said cause, and sum-
mon them according to the command of the writ.    *Rev., p.*
527, §§ 18, 26; *Gen. Stat., p.* 1849.    The act of 1898 in its
modification of the law relating to struck juries in criminal
cases provides for the selection of ninety-six persons in the
list from which the jury is to be struck, and provides that
twenty-four names shall be struck by the prosecutor and by
the accused respectively in the usual manner, and the remain-
ing forty-eight names shall be returned as the panel of jurors,
and their names be placed in the box by the sheriff, and the
jury for the trial of the case shall be drawn in the usual way.
*Pamph. L.* 1898, *p.* 895, § 76.    This section further provides
that on the trial of any indictment for which a struck jury
shall be summoned and returned five peremptory challenges
shall be allowed to the defendant and the same number to the
state.    *Id., p.* 896, § 81.

By 22 *Hen. VIII.*, c. 14, persons indicted for petit treason,
murder or felony were admitted to challenge peremptorily
twenty of the jurors returned.    This statute was in force in
England at the time of the Revolution.    By an act of the
legislature passed in 1795, it was provided that every person
indicted for treason, murder or other crimes punishable with
death, or for misprision of treason, manslaughter, sodomy,
rape, arson, burglary, robbery or forgery, was admitted to chal-
lenge peremptorily twenty of the jurors; and it was further
provided that neither the attorney-general nor any person
prosecuting for or in behalf of the state should be admitted

in any case to challenge any juror without assigning a cause certain, and that the privilege of peremptory challenges should not be allowed to offenders in any cases except such as are specified above. *Rev. L., p.* 184. These provisions are contained in section 6 of the revision of 1845, with the addition thereto of perjury and subornation of perjury. *Rev. Stat., p.* 294. Struck juries were allowed in England in the trial of civil cases from an early period, and by 3 *Geo. II.*, were authorized in criminal cases on the trial of an indictment or information for any misdemeanor or information in the nature of *quo warranto.* The statute did not apply to indictments for treason or felony, and consequently a special jury in England was not allowed in cases of treason or felony. 21 *Vin. Abr.* 301, *tit. " Trial," D, e.* 2. This statute was embodied in the act of 1797, as section 14, with the proviso that it should "not extend to any indictment for any offence where the party is entitled to challenge peremptorily or without cause shown " (*Rev. L., p.* 313), and was included in the act concerning juries and verdicts in the revision of 1845. *Rev. Stat., p.* 968. In the revision of 1874 it was embodied in the act concerning juries without the exception contained in section 14 of the act of 1797, and the right to order a struck jury was thereby conferred on the trial of any indictment. *Rev., p.* 527, § 12. The statutory provisions with respect to struck juries as contained in the revision of 1874 were retained in the act of 1898, with modifications with respect to the number of jurors to be selected and the number to be struck by the prosecutor and the accused respectively, and also allowing to the prosecutor and the accused each five peremptory challenges. *Pamph. L.* 1898, *p.* 895, §§ 75, 76, 81.

Peremptory challenges allowed to the accused on the trial of criminal cases are now regulated by sections 80 to 83 inclusive of the act of 1898. Every person indicted for treason, murder, &c., is admitted to challenge peremptorily twenty of the jurors summoned, and the state is entitled to challenge peremptorily twelve; and on the trial of an indictment where twenty peremptory challenges are not allowed, the defendant

and also the state are entitled each to challenge peremptorily ten of the general panel of jurors summoned and returned. These two provisions do not apply to trials where a struck jury is ordered. In such cases the number of peremptory challenges allowed as the jury is drawn from the box, is limited to five by the defendant and the same number by the state.

The record shows that application was made to the court by the prosecutor of the pleas for a struck jury, and that the court granted the motion and fixed September 12th as the time for striking, and directed notice to be given for that day. On that day the counsel of the prisoner appeared and objected to the striking of the jury, on the ground that the statute under which the jury was to be struck was unconstitutional and void. The court overruled the objection and exception was taken.

By the constitution of 1776 it was provided " that the inestimable right of trial by jury shall remain confirmed as part of the law of this state without repeal forever." *Art.* 22. The provisions on this subject in the constitution of 1844 are as follows (*Art.* 1, § 7): " The right of a trial by jury shall remain inviolate, but the legislature may authorize the trial of civil suits when the matter in dispute does not exceed $50, by a jury of six men." Section 8 provides that " in all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury ; to be informed of the nature and cause of the accusation ; to be confronted with the witnesses against him ; to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel in his defence."

Two grounds are alleged in the brief of the counsel of plaintiff in error for the contention that the act of 1898 is unconstitutional. *First.* Because the crime with which he was charged was a felony at common law, and a struck jury could not be had at common law in cases of felony, and hence under our constitution the legislation for struck juries in

capital cases is unconstitutional. *Second.* That being tried by a struck jury the accused was deprived of his common law right of twenty peremptory challenges.

Trial by jury as the means of determining questions of fact is of great antiquity. Its origin, notwithstanding the investigations to which the institution has been subjected, still remains in obscurity. In the "Mirror of Justice" satisfactory evidence is furnished that in criminal cases in the time of King Alfred trial by jury was trial by a jury of twelve men, who were sworn and whose verdict was required to be by the concurrence of all. It is said that King Alfred caused forty-four justices in one year to be punished for false judgment. In the enumeration given it is stated that he punished Cadwine " because that he judged Hackwy to death without the consent of the jurors, whereas he stood upon the jury of twelve men and because three would have saved him against nine. Cadwine removed the three and put others upon the jury, upon which Hackwy put not himself." " He punished Markes because he judged During to death by twelve men who were not sworn." " He punished Freburne because he judged Harpin to die, whereas the jury were in doubt as to their verdict, for in doubtful cases one ought rather to save than to condemn." *Mirr. J., c.* 5, ¶ 108, (3), (7), (15). This treatise, Mr. Finlason says, though published in the time of Edward I., bears on its face traces of an origin in an earlier work of the age of Alfred, and that there is no doubt it embodies the Dom Boc of Alfred. 1 *Reeve Hist.* 24 *n.*, 37 *n.* "The most ancient traces of trial by jury, qualified by an oath and consisting of twelve men," says Selden, " are to be found in the law of the king Ethelred, which provided that in every hundred let there be a court, then let twelve freemen of mature age, together with their foreman, swear upon the holy relics that they will condemn no innocent and absolve no guilty person." *Seld. Dis. (Bac. ed.), c.* 6, *p.* 37.

Mr. Justice Wilson, of the Supreme Court of the United States, in his lectures on the law, referring to the evidence on this subject, says that " to King Alfred the world is indebted

for the unanimous *duodecemiral* judgment." 2 *Wils. Works*
323, 327, 329, 349.   Blackstone says that "some authors have
endeavored to trace the original of jurors up as high as the
Britons themselves, the first inhabitants of our island ; but
certain it is that they were in use among the earliest Saxon
colonies. * * *   In England we find actual mention of
them so early as the laws of King Ethelred, and that not as
a new invention." 3 *Bl. Com.* 349.   Mr. Sullivan speaks
of the antiquity of trial by jury among the German nations,
and especially the procedure in force among the Salian Franks
and Ripurian Franks, tribes of Germans located on the Rhine.
Speaking of the introduction of this method of trial being
attributed by the English lawyers to Alfred, he says :
"Alfred's merit was rather in fixing the number and deter-
mining the qualities of the jurors than in the invention."
*Sulliv. Lect.* 42, 43, 44, 274.   Mr. Finlason, in his note to 1
*Reeves Hist. Com. Law* 474, says : " It is certain that in
Alfred's time there was trial by jury in criminal cases, and
equally certain that jurors in those days were witnesses, and
that if there were no witnesses, as there could hardly be in
many criminal cases, as murder, there could be no trial by
jury, and, therefore, the ordeal was resorted to in default of
witnesses ; * * *   that there can be no doubt that trial
by jury very gradually superseded every other mode of trial."
Sir Edward Coke says : " This trial of the fact is very ancient
and was the law before the conquest." 1 *Co. Litt.* 155 *b*.
Mr. Reeves says that it was not till the reign of Henry II.
(which was before Magna Charta) that the trial by jurors be-
came general, and that the progress made in bringing this
trial into common use was attributed to a law enacted by that
king, which ordained that all questions of seisin of land should
be tried by a recognition of twelve good and lawful men,
sworn to speak the truth.   The proceeding was called *per*
*assisam* and *per recognitionem*, and the persons composing it
were called *juratores, jurati, recognitores assisæ*, and col-
lectively *assisa* and *recognito*.   The author further says that
the oath of twelve jurors was resorted to in other instances

than those provided by this law, and then this proceeding was said to be *per juratam patriæ*, or *vicineti, per inquisitionem, per juramentum legalium hominum.* This proceeding by a jury was no other than that which had been mentioned as having gained ground by usage of custom. It was sometimes used in questions of property, but it should seem more frequently in matters of a criminal nature. 1 *Reeves Hist. Com. Law* 139, 140. It is conceded by all who have written on this subject, that before Magna Charta trial by jury was a trial before a tribunal established for the determination of matters of fact, consisting of twelve men, whose decision could only be by the consent of all. Consequently when by Magna Charta it was "granted also and given to all the freemen of our realm for us and our heirs forever these liberties underwritten," among which are "no freeman shall be taken or imprisoned nor disseised nor outlawed nor banished nor in any wise be damaged nor shall the king send him to prison by force, except by the judgment of his peers or by the law of the land;" trial by jury as previously known to the law was comprised in the phrase "legal judgment of his peers or by the law of the land." 1 *Reeves* 246, note.

The qualifications of jurors and the means by which they were to be selected and empaneled constituted no part of the essential features of trial by jury at common law. Thus in the earlier periods jurors found their verdicts upon their own knowledge of the matters of fact, and consequently they were frequently called twelve witnesses and their verdicts the testimony of twelve credible men; and they were selected from the villa or place where the offence was committed or the dispute arose; and it was a good cause of challenge to the array that there were not upon the panel returned by the sheriff a sufficient number of hundredors. *Arundel's Case*, 6 *Co.* 14. This practice had fallen into disuse, without being changed by statute, until 24 *Geo. II.*, c. 18, by which jurors were required to come from the body of the county. By the common law jurors were required to be freeholders whose possessions in the whole amounted yearly to above the sum of five hundred

marks. *Fortesc., c.* 29, *p.* 67. By 2 *Hen. V., c.* 3, on the trial of a criminal case it was provided that jurors should have lands and tenements of the value of forty shillings per annum. By subsequent statutes the value of jurors' freeholds was changed from time to time, and in cities and boroughs a citizen worth forty pounds in personal estate was qualified as a juror, though he had no freehold. 2 *Hale* 272, 274. By the common law the king was entitled to challenge peremptorily any number of jurors without alleging any reason other than *quod non boni sunt pro rege.* By 33 *Edw. I., c.* 4, the right of peremptory challenge was taken from the king. By 22 *Hen. VIII., c.* 14, § 7, made perpetual by 32 *Hen. VIII., c.* 3, the number of peremptory challenges permitted to the accused arraigned for petit treason, murder or felony was reduced to twenty. By 33 *Hen. VIII., c.* 23, in cases of high treason or misprision of treason, peremptory challenges were not allowed to the accused. This right of peremptory challenges was allowed only in favor of life, and was never allowed to a person accused of a mere misdemeanor. 1 *Chit. Crim. L.* 535. At common law the accused had his challenges for cause without limit, as well as his peremptory challenges. *Fortesc., c.* 27. Parliament never interfered with challenges for cause. Hence it became the common law that the accused had a right to trial by a common law jury and by an impartial jury as at common law.

The above in brief is a statement of the condition of the English law so far as is pertinent to the present subject at the time of the declaration of independence. It will be observed from the course of legislation in England prior to that time that the subject of qualifications of jurors, as well as the right of peremptory challenges, were matters of legislation, which was exercised in one instance at least to reduce the number of such challenges previously allowed to an accused, and in another instance to deprive the accused of peremptory challenges. Although trial by jury was guaranteed by Magna Charta and secured to Englishmen as an inalienable right, the mode in which jurors were selected, their qualification and extent of

the right of peremptory challenges were matters committed to parliament. It would have been an intolerable grievance to have fixed in the constitution of England unalterably all the details connected with trial by jury which were suitable to a prior age, but unsuited to later times.

In this country, where the constitutions provide that the right of trial by jury shall remain confirmed as part of the law of the land, or the right of trial by jury shall remain inviolate, the words " trial by jury " import a trial by a jury of twelve men, impartially selected, who must unanimously concur in the verdict. Consequently under such constitutional provisions an act of the legislature which provided for a jury in criminal cases of less than twelve, or a verdict by the concurrence of less than that number, would be unconstitutional. *Thompson* v. *Utah*, 170 *U. S.* 343, 349 ; *Work* v. *State of Ohio*, 1 *Lead. Crim. Cas.* 482.

The provision in our constitution (paragraph 8), that the accused should have a right to a speedy and public trial by an impartial jury, secured to the accused a right to a trial by an impartial jury by an express constitutional provision. The means by which an impartial jury should be obtained are not defined. In neither of the constitutional provisions on this subject is there any requirement with respect to challenges, or to the qualifications of jurors, or the mode in which the jury shall be selected. These subjects were left in the discretion of the legislature, with no restriction or limitation, except that the accused should have the right to be tried by an impartial jury. The provisions on this subject in Magna Charta, as well as those in our constitution, apply to criminal cases of all grades, misdemeanors as well as common law felonies. If twenty peremptory challenges are essential to secure an impartial jury, then there has not been in England, nor is there in this state, any constitutional mode of trying criminal cases of a grade less than those enumerated in the statute of Henry VIII., and in the act of 1795. It seems to me that it is inconceivable that a jury should be an impartial jury for the trial of an indictment, say, for having burglars'

tools with intent to use them, the penalty for which is imprisonment for the term of seven years, and not an impartial jury on a prosecution for burglary, the punishment for which is seven years, or on an indictment for entering with intent to steal, &c., the penalty for which is also seven years; or an impartial jury in the trial of an indictment for an assault and battery with intent to commit murder, the punishment for which is imprisonment for seven years, and not an impartial jury in the trial of an indictment for manslaughter, &c., the penalty for which is ten years. Burglary and manslaughter are in the act of 1795; the other offences just enumerated are not within that statute. Yet, if the act of 1795 has become so imbedded in the constitution of this state as to fix a constitutional right to twenty peremptory challenges in an accused upon an indictment for murder, the same constitutional right will inhere in persons accused of any one of the offences enumerated in that act.

In the treatises on this subject, as well as in the decisions of the courts, there is a consensus of opinion in defining right of trial by jury under constitutional provisions such as ours as it is here defined with respect to the legislative power over trial by jury. An act diminishing the number of a jury or altering any of its essential features, as for instance dispensing with unanimity or depriving a party of challenges for cause— the purpose of which is to exclude jurors who are not impartial—would be clearly unconstitutional, but it is otherwise of a law merely providing the mode of securing a trial by jury. "Although by the common law, at the adoption of the constitution, a person charged with a capital offence could challenge twenty jurors peremptorily, yet it has been held that a law reducing the number of such challenges to twelve was not unconstitutional or an infringement of the sacred right of trial by jury." 1 *Lead. Cr. Cas.* 495, 496. "The legislature has the power to confer the right to challenge peremptorily upon the parties litigant in civil actions and proceedings, and the state and the accused in criminal cases, and by reason of the power so vested, and so long as the right to

trial by jury is preserved and means are provided whereby impartial jurors can be obtained, it may make changes in existing laws and increase or decrease the number of challenges to which either the state or the defendant may be entitled." 12 *Encycl. Pl. & Pr.* 478; 1 *Bish. Cr. Pro.* 941.

The constitution of New York preserves the trial by jury in all cases in which it had been theretofore used. In Walters *v.* People, which was an indictment for murder, the question was whether an act which conferred on the people the right to challenge five of the persons drawn as jurors peremptorily was constitutional, there being no right on the part of the prosecution to challenge peremptorily when the first constitution of the state was adopted. The court sustained the constitutionality of the act, and in doing so used this language: "This certainly is no limitation of or restriction upon the legislative power except as to the right guaranteed, viz., a jury trial in all cases in which it had been used before the adoption of that instrument. I am not aware of any other constitutional provision that may be supposed to have the remotest bearing upon the question. Trial by jury cannot be dispensed with in criminal cases, but it is obviously within the scope of legislation to regulate such trial. I entertain no doubt that it is entirely competent for the legislature to declare that either the people or the accused may have their challenges without assigning cause and to limit the number of them. The subject of peremptory challenges has always been under legislative control, and it is only within a comparatively recent period that the right has been extended even to the accused in a minor class of criminal offences. Even if it were a right given by common law it could be restrained, limited or withheld altogether at the legislative will." 32 *N. Y.* 147, 159.

In Stokes *v.* People, which was a writ of error on a conviction for murder, the question was as follows: At common law a juror having formed or expressed an opinion conclusively proved a want of impartiality, and excluded the juror without inquiry as to whether this would influence his

actions as a juror. An act of the legislature of New York, provided that the previous formation or expression of an opinion or impression in reference to the circumstances upon which any criminal action is based, or in reference to the guilt or innocence of the prisoner, or a present opinion or impression in reference thereto, should not be a sufficient ground of challenge, provided the person proposed as a juror should declare on oath that he verily believes that he can render an impartial verdict according to the evidence submitted to the jury on the trial. The question was as to the constitutionality of this act of the legislature. The act was sustained and the court in its opinion said : " The position of the counsel for the accused is that the right of trial by jury is secured to persons accused of felony by the constitution, and that this secures the further right of trial by an impartial jury. We shall assume the correctness of the latter position. Any act of the legislature providing for the trial otherwise than by a common law jury composed of twelve men would be unconstitutional and void, and any act requiring or authorizing such a trial by a jury partial or biased against either party would be a violation of one of the essential elements of the jury referred to in and secured by the constitution. * * * It will be seen that the intention of the act was not to place partial jurors upon the panel, but that great care was taken to prevent such a result. The end sought by the common law was to secure a panel that would impartially hear the evidence and render a verdict thereon uninfluenced by any extraneous considerations whatever. * * * While the constitution secures the right of trial by an impartial jury, the mode of procuring and empaneling such a jury is regulated by law, either common or statutory, principally the latter, and it is in the power of the legislature to make from time to time such changes in the law as it shall deem expedient, taking care to preserve the right of trial by an impartial jury." 53 *N. Y.* 164, 171, 172, 173.

The courts of Massachusetts and Connecticut, as well as courts of other of our sister states, have held that the legislature

may confer upon the prosecution a right of challenge on the trial of capital offences that did not exist when the constitution was adopted. *Commonwealth* v. *Dorsey*, 103 *Mass.* 412; *State* v. *Hoyt*, 47 *Conn.* 518. The constitution of Pennsylvania provides "that the trial by jury shall be as heretofore, and the right shall remain inviolate." A statute which conferred upon the state challenges, where challenges were not allowed at the formation of the constitution, was held to be constitutional. Mr. Justice Thompson, delivering the opinion of the court, said: "There is no violation of the right unless the remedy is denied or so clogged as not conveniently to be enjoyed. * * * It would be difficult to prove that a limited number of such challenges by the commonwealth necessarily deprives the prisoner of any of his rights. Impartiality is presumed and is the right of both sides in a criminal trial. To attain this was undoubtedly the object of allowing challenges at all. Whatever, therefore, tends to this end and no more surely takes away no right." *Warren* v. *Commonwealth*, 37 *Pa. St.* 45; *Hartzell* v. *Commonwealth*, 40 *Id.* 462.

In *Proff. Jury Trial*, § 106, the doctrine is stated in these words: "The legislature may limit the number of peremptory challenges, even in capital cases, without infringing on the constitutional right; for this right is to have twelve free and lawful men, who are impartial between either party, who will by a unanimous verdict find the truth of the issue; and any legislation, therefore, which merely points out the mode of arriving at this object, but does not rob it of any of its essential ingredients, cannot be considered an infringement of the right." In *Thomp. & Merr. Juries*, § 163, it is said: "The subject of peremptory challenge has always been under legislative control, and it has been held by a long and unbroken line of decisions that the legislature has power at all times to increase or diminish the number of peremptory challenges to be allowed to the state or defendant in criminal cases." The subject is discussed in the notes to *Work* v. *Ohio*, 1 *Lead. Cr. Cas.* 482, 492, 496, and the power to increase or

diminish the number of peremptory challenges allowed to the state and the defendant respectively is affirmed.

In Hayes *v.* Missouri, Mr. Justice Field, in discussing the office of peremptory challenges, used this language: "The constitution of Missouri, and indeed every state of the Union, guarantees to all persons accused of a capital offence or of a felony of lower grade the right to a trial by an impartial jury selected from the county or city where the offence is alleged to have been committed, and this implies that the jurors shall be free from all bias for or against the accused. In providing such a body of jurors the state affords the surest means of protecting the accused against an unjust conviction and at the same time of enforcing the laws against offenders meriting punishment. To secure such a body numerous legislative directions are necessary, prescribing the class from which the jurors are to be taken, whether from voters, taxpayers and freeholders or from the mass of the population indiscriminately; the number to be summoned from whom the trial jurors are to be selected; the manner in which their selection is to be made; the objections that may be offered to those returned, and how such objections shall be presented, considered and disposed of; the oath to be administered to those selected; the custody in which they shall be kept during the progress of the trial; the form and presentation of their verdict, and many other particulars. All these, it may be said in general, are matters of legislative discretion. But to prescribe whatever will tend to secure the impartiality of jurors in criminal cases is not only within the competency of the legislature but is among its highest duties. It is to be remembered that such impartiality requires not only freedom from any bias against the accused but also from any prejudice against his prosecution. Between him and the state the scales are to be evenly held. * * * In this country the power of the legislature of a state to prescribe the number of peremptory challenges is limited only by the necessity of having an impartial jury." 120 *U. S.* 68.

The cases cited affirm the constitutionality of statutes con-

ferring upon the prosecution a right of peremptory challenges, or increasing the number of challenges beyond those allowed at the time of the adoption of the constitution. The act authorizing a struck jury in criminal cases is not unconstitutional in that it allows the state a right to strike from the list an equal number of persons selected as jurors and to challenge an equal number with the defendant at the time the jury is empaneled. The principle on which these decisions were rested and which was affirmed as the ground of decision, applies as well to statutes which reduce the number of challenges allowed to the accused, provided an impartial jury is secured. It was accordingly held in *Dowling* v. *State, 5 Sm. & M.* 664, that a statute that reduced the number of peremptory challenges allowed to a prisoner to twelve in capital cases was not an infringement of the clause of the constitution which provided that the right of trial by jury should remain inviolable.

I find on examination in several of our sister states, whose jurisprudence is founded upon the common law, and with constitutional provisions on the subject of trial by jury in criminal cases similar to ours, the number of peremptory challenges in the trial of capital cases has been reduced below the number that existed in England at the time of the separation. In California, in capital cases or where the punishment is imprisonment for life, the defendant has ten, the state five. In Colorado, the people and the accused are entitled each to fifteen in capital cases. In Florida, in capital cases, the state has six; in cases not capital, the state and the defendant have four each. In Kansas, in capital cases or where the punishment is imprisonment for life, the defendant has twelve, the state six. In Maine, in capital cases, the defendant may challenge ten while the jury is being formed and one more after it is complete. In Mississippi, in capital cases, the defendant has twelve, the state six. In Nebraska, in capital cases, the defendant has sixteen, the state three. In Nevada, in capital cases, the defendant has ten, the state five. In Oregon, in capital cases or where the punishment is imprisonment for

life in the penitentiary, the defendant has twelve, the state six. In Vermont, in all criminal prosecutions in the county court, the defendant has six, the state has two. In Virginia, upon the trial of a felony, a panel of sixteen is formed, from which the defendant may strike four. The state has no right of peremptory challenge. *Thomp. & Merr. Juries,* § 165. Notwithstanding these departures from the common law, I do not find that the power of the legislature to limit or reduce the number of peremptory challenges to the accused was ever contested, except in *Dowling* v. *State, supra,* with the result above set out. In *State* v. *McClear,* 11 *Nev.* 39, the constitutionality of a jury law of 1875 was under consideration. The act in question permitted twelve peremptory challenges to the accused and to the state in offences punishable with death or imprisonment for life, and in effect deprived the accused of challenges for cause. The court held the act in this respect to be unconstitutional—that it was not in the power of the legislature to deprive a citizen accused of crime of the right to challenge a juror for actual bias. This decision proceeded on the ground that the constitution secured to the accused a trial by an impartial jury, and that a statute which impaired the right of challenging for a cause touching the impartiality of a juror was void. A distinction was made in the case between challenges for bias, which exist as a matter of right, and peremptory challenges, which were allowed by favor of the legislature and had always been regulated by statute.

The course of legislation in England is in affirmance of the right of parliament to reduce the number of peremptory challenges allowed to an accused as not being an invasion of the right of trial by jury secured by Magna Charta. Before Magna Charta any man accused of treason or felony was allowed to challenge for cause without limit, and also to challenge five-and-thirty of the jurors without assigning cause. *Fortesc., c.* 27, *p.* 12 ; 2 *Trial Per Pais* 600. Such was the condition of the law of England at the time of Magna Charta, and continued to be until 22 *Hen. VIII., c.* 14, which enacted

" that no person arraigned for petit treason, murder or felony be admitted to any peremptory challenge above the number of twenty ; " and by 33 *Id.*, *c.* 23, it was enacted " that in cases of high treason or misprision of treason peremptory challenge should not be allowed." The statute of 1 & 2 *P. & M.*, *c.* 10, enacted " that all trials for any treason shall be according to the due course of the common law ; " and thereupon it was held that the common law right of challenging peremptorily thirty-five jurors was restored in cases of treasons. 3 *Co. Inst.* 27, 227 ; 1 *Chit. Cr. L.* 534 ; 1 *Co. Litt.* 156 *b ;* 2 *Hale* 268, 269.

By the common law, from time immemorial, before Magna Charta and for upwards of three centuries thereafter, thirty-five peremptory challenges were allowed to the accused in treason or felony. The statutes of Henry VIII. wholly deprived persons accused of treason of peremptory challenges and reduced the number of peremptory challenges allowed on the trial of indictments for felony from thirty-five to twenty. Magna Charta is styled " the charter of the liberties of Englishmen " and occupies in the constitutional law of England the place of our written constitutions. Sir Edward Coke says : " This statute of Magna Charta has been confirmed about thirty times and commanded to be put in execution. By the statute of 25 *Edw. I.*, *c.* 2, judgments given against any points of the charters of Magna Charta or Charta de Foresta are adjudged void, and by the statute of 42 *Edw. III.*, *c.* 1, if any statute be made against either of these charters it shall be void." 1 *Co. Litt.* 81 *a ;* 3 *Co. Inst.* 110. There is not in any decision or treatise on the law of England any scruple expressed with respect to the validity of those statutes which reduced the number of peremptory challenges below those which were previously allowed at common law or that such legislation trenched upon the rights and liberties secured by Magna Charta. From Henry VIII. until the Revolution the principle was recognized as part of the common law of England that trial by jury consisted in a trial by a jury of twelve men, who

should unanimously concur in the verdict, and that the number of peremptory challenges allowed by the common law or granted by statutes from time to time were matters within the control of parliament. Such was the common law of England at the Revolution.

With full knowledge of the course of legislation in England, and also of the control of parliament over the subject of peremptory challenges, it was declared in our first constitution that the right of trial by jury should remain confirmed as part of the law of this colony without repeal forever. A precedent may be found in this state illustrative of the legislative power over peremptory challenges. By the common law of England at the time of the adoption of our first constitution the accused on the trial of an indictment for treason was entitled to thirty-five peremptory challenges. Such became the law of this state and continued to be until the act of 1795, which restricted the right of peremptory challenge by an accused on the trial of an indictment for treason to the number of twenty. By the constitution of 1844 it was declared that the right of trial by jury should remain inviolate, and a clause was added that in all criminal prosecutions the accused should have a right to a speedy and public trial by an impartial jury. In State *v.* Fox, Chief Justice Green, referring to the clause just quoted, said : " This clause confers upon defendants in criminal cases no new right. It invests with the constitutional sanction what was previously a common law right. Every criminal is entitled at common law to a trial by *an impartial jury.* The question still remains, what constitutes impartiality, or, rather, what is the test or evidence of that bias or partiality which disqualifies the juror? This must be settled by common law principles. The question has undergone such repeated and elaborate discussion that no new light can be hoped for. A further discussion would be misplaced. It is proposed simply to advert to some of the leading cases in the books and state briefly the grounds on which the decision must rest." 1 *Dutcher* 589. The Chief Justice then proceeded to discuss

the grounds of challenge for cause—the method provided by the common law by which jurors who were not impartial were excluded from the jury. . It will be observed also that in *Stokes* v. *People, supra,* the legislature had modified the grounds on which at common law a juror on a challenge for cause would be disqualified to become a juror in the trial of a criminal case, and that legislative action was sustained by the court. The authorities cited exhibit unanimity in judicial opinions affirming the principle that the duty of providing means of obtaining an impartial jury marks the limit of legislative control over the incidents of trial by jury, including the right of challenges.

Struck juries, under the name of special juries, were resorted to in the English courts at an early period for the purpose of obtaining jurors in the trial of civil cases. In King *v.* Edmunds, which was an indictment for conspiracy, tried before a special jury, Chief Justice Abbott said : " It cannot be, or at least has not hitherto been, ascertained at which time the practice of appointing special juries for the trials at Nisi Prius first began. It probably arose out of the practice of appointing juries for trials at the bar of the courts of Westminster, and was introduced for the better administration of justice and for securing the nomination of jurors duly qualified in all respects for their important office." 4 *Barn. & Ald.* 476. By our statute the judge is required to select the names of such persons qualified as jurors " as he shall think most impartial and indifferent between the parties, and best qualified as to talents, knowledge, integrity, firmness and independence of sentiment, to try the said cause." The striking of the jury is upon notice to the accused or his counsel ; it takes place in the presence of the sheriff and of the prosecutor and of the accused and his counsel, if they desire to be present. From the ninety-six names selected, the accused or his counsel is permitted to strike twenty-four. The forty-eight names that remain after the prosecutor and the accused have completed the striking, are returned as the panel from which the jury of twelve men is to be selected. The list from which

such panel is to be selected is in the hands of the accused or his counsel at least twelve days before the empaneling of the jury. In this instance the list was in the hands of the counsel of the accused from September 13th to October 3d, when the trial began. At the time of the selection of the jurors the accused is allowed to reject twenty-four names peremptorily, and he is allowed the right to challenge for cause without stint. Ample time is afforded to him between the striking of the panel of jurors to be returned and the time of drawing the trial jury to enable counsel to ascertain grounds of objection to individual jurors which would be available upon a challenge for cause; and the accused is allowed in addition five peremptory challenges as the names are drawn from the box. As the right of challenge is not a right to select, but to exclude, the accused on the striking of the jury has power to exclude twenty-four at will, and at the drawing of the names from the box to form the jury of twelve, he has in addition five peremptory challenges. It may be, as contended by the counsel of the accused, that the striking of twenty-four names from the list of jurors is not equally advantageous with a challenge in open court, upon a view of the jurors as their names are called when drawn from the box; but the legislative power over challenges is not limited by such a consideration.

The power of the legislature is put at issue by this exception. Conceding to that department of the government its legislative functions, which, when within constitutional limitations and restrictions, are beyond the control of the judiciary, the courts cannot interfere with its discretion on considerations of policy or abstract justice. A clear case of the infringement or invasion of some constitutional right must be disclosed to justify the intervention of the courts to nullify an act of the legislature. The only restriction on the power to legislate on this subject springs from the duty to secure an impartial jury, and it cannot be affirmed that the legislature has exceeded constitutional limitations in adopting trial by a struck jury in cases of this character—a mode of trial in force

in England, before the separation of the colonies, for the trial of misdemeanors, and in this state, since the Revolution, for the trial of misdemeanors and high statutory crimes. *State* v. *Fowler*, 29 *Vroom* 423; *Moschell* v. *State*, 24 *Id.* 498. Nor can it be successfully maintained that a jury composed of persons of the qualifications contemplated by the Struck Jury act, selected as therein provided, with the right to strike off twenty-four names from the list of persons and challenges for cause without limit and the peremptory challenges given by the act, is not an impartial jury for the trial of criminal prosecutions of every grade within the meaning of the constitutional prescription.

The statement in the brief of counsel that this mode of trial is at the option of the prosecutor, is incorrect. Either the accused or the prosecutor may apply for such a jury, but neither can obtain it unless in the judgment of the court the case is one that is proper to be tried by a struck jury. The same discretion is conferred upon the court in ordering struck juries in civil cases. In New York an act was recently passed providing for special juries by a proceeding analogous to the method of obtaining and selecting struck juries in this state. That act gave to the court, on the application of either the district attorney or of the defendant, authority to grant a trial by a special jury in its discretion. On an appeal which brought up a conviction for murder, it was insisted by the defendant that this act created two classes of jurors for the trial of criminal cases, and discriminated unequally, and was therefore in violation of the constitution. The Court of Appeals, in a recent case, affirmed the constitutionality of the act, and held that it did not violate the constitutional guarantee of due process of law. *People* v. *Dunn*, 52 *N. E. Rep.* 572.

The objection to the mode of trial adopted in this case is without substance, unless words are interpolated in the constitutional provision making peremptory challenges to the number of twenty in this class of prosecutions a constituent part of the constitution; and for that mode of dealing with the constitution there is no sanction.

This exception is overruled.

The next class of exceptions relate to the organization of the trial jury.

That a venire was issued and returned appears from the colloquy between counsel, the clerk and the court. It is not printed in the case. It is stated that eleven of the jurors were returned not found. It also appears in the same manner that physicians' certificates were presented to the court that two of the jurors were not able to attend; and that there were three absentees who were not excused. On this condition of the panel the defendant's counsel moved to quash the panel and that a venire be issued to summon a common jury to try the case. This motion was denied and exception was taken. Section 19 of the Jury act provides that where a rule for a struck jury is entered it shall remain in force until the cause is tried, and no common jury shall be summoned therein unless the said rule shall be first vacated by the court, except as provided in the statute. *Rev., p.* 527, ¶ 13. The exception is that where the defendant has a rule for a struck jury and shall not procure the jury to be struck and the panel duly certified to be delivered to the plaintiff or his attorney twelve days before the day appointed for trial, the plaintiff may issue his venire for a common jury; and if the defendant shall have a rule for a trial by proviso, and the plaintiff a rule for a struck jury, then if the plaintiff shall not procure the jury to be struck and the panel thereof to be delivered to the defendant as aforesaid the defendant may issue his venire for a common jury. It is not within the power of the sheriff in summoning the jury to deprive the parties of the mode of trial prescribed by the statute, nor is it necessary that the whole number of jurors specified in the panel should be present when the case is called for trial. *Patterson* v. *State,* 19 *Vroom* 381; *Smith* v. *Smith,* 23 *Id.* 207 ; *King* v. *Hunt,* 4 *B. & Ald.* 430 ; *King* v. *Edmonds, Id.* 471. No application was made to postpone the trial of the case until two of the jurors had been called, accepted and sworn. A postponement at that stage of the proceedings was impracticable.

During the calling of the jurors to form a jury two of the jurors summoned were excused by the consent of counsel, and seven of the jurors were permitted to stand aside by consent of counsel.  When eleven jurors had been secured the panel was exhausted, and the court directed the names of those who had been permitted to stand aside to be again put in the box. This was strictly in accordance with the practice.   The twelfth juror was obtained from the jurors whose names were put back in the box.  The jury who tried the case was obtained from the panel of jurors selected and certified by the court.

The exceptions to the several rulings of the court in empaneling the jury are not sustained.

The next exception is to the admission in evidence of a statement made by the prisoner immediately after his arrest.

After the killing of the deceased the prisoner was arrested by Officer Myers.  He was searched, and on his person were found a revolver and a black bag containing articles which are described by the police detective as follows: "This is a key-opener or key-turner; I have seen them on prisoners that have been arrested; it is called a key-turner; this other instrument will turn a lock without a key in it; this other one will open the latch in windows; this other is three screwdrivers in one; this other is a jimmy; it will open bureau drawers or a door; this is a bunch of skeleton keys for opening any door; this other is a bunch of common keys." There were nineteen keys, thirteen of which were skeleton keys and six ordinary keys.   The officer testified that all the articles except the screw-driver he had seen many times and had found them on burglars and sneak-thieves.  After the prisoner was searched and had been examined by the doctor, then, in the presence of Captains Fanning and Hayes, two captains of the police in Hoboken, in the office of the chief of police, the prisoner made a statement.   Hayes testified: "I first introduced Captain Fanning to him; I said, 'This is Captain Fanning and I am Captain Hayes, at the same time acting chief of police; have you any objection to making a

statement to us in regard to this case?' he said, 'No;' I then told him I would take it down in writing and would use it against him at his future trial, but that it would be voluntary on his part to give it to me; otherwise there was no compulsion on him to give it; he said, 'All right;' he then made the statement and it was reduced to writing by me; I read it to him twice and he signed his name to it." This testimony was sufficient to make the prisoner's statement competent evidence. *Roesel* v. *State, ante pp.* 216, 228.

The following is the statement of the prisoner: "James K. Brown; thirty-four years; born in Jersey City; number of street I will not tell; I live in Erie street, Jersey City; a carpenter by trade; at present out of work; I am married; I have three children.

"*Q.* Who did you work for last?

"*A.* I won't state; I came here to-day to look for work the burglars' tools I was going to throw in the river; as to killing the officer, I am very sorry; I had no intent to do so; I only tried to escape on account of having the burglars' tools; the officer came to me on the corner [Twelfth and Bloomfield]; he said, 'What are you doing here?' I answered, 'I expect to find a friend;' 'Who is this with you?' 'A friend of mine;' the reason I answered this way was to get him to walk a block or so to allay his suspicion; I then attempted to run away from him; he arrested me, knocked me down and punched me; I tried to get up by placing my hand on his face; he bit my finger; I got up, but he still held to my finger, and my greatest effort could not release it; his hands were then free; he either hit me with the butt of his pistol or stick, which staggered me; I then pulled my hand from his mouth and dodged to one side and ran; he was directly behind me.

"*Q.* Then you are trying to make us believe that you killed him in self-defence?

"*A.* I do not; I wanted to escape only; I could not get away; I looked back and saw him with what I supposed was his revolver; I drew my pistol and said to him, 'Go 'way from me;' he still followed me; I thought he was going to

shoot; I pointed my revolver with the intention of frightening him away; I then fired at him three times; each shot took an effect."

The prisoner was a witness in his own behalf, and it was brought out on cross-examination that he had been a prisoner in the state prison at Sing Sing for two years, from July, 1895, to July, 1897. He declined to answer the question whether he had been in any other prison; he declined to answer the inquiry whether he had been convicted of the crime of burglary in the third degree, in the General Court of Sessions of New York, on the 20th of June, 1879; and to the inquiry where he had been convicted of burglary of the third degree, in the city of New York, September 17th, 1891, his answer was, "Not in the year 1891; I was convicted, but what date I don't know." To the question whether he was convicted of the crime of grand larceny in the second degree, in the Court of Quarter Sessions, in June, 1895, he answered "Yes." This cross-examination was proper, at least for the purpose of showing the character of the prisoner as a witness. *Gen. Stat.*, *p.* 1399, § 9. It was competent also with respect to the right of the deceased to arrest him.

The remaining exceptions were directed to the charge, of the court.

The deceased was appointed a police officer of the city of Hoboken, on the 18th of May, 1891. The transaction which resulted in his death occurred in the afternoon of the 29th of July last (1898), about half-past four. The deceased was on duty at that time in citizen's dress, detailed on detective work. The prisoner, in his testimony, said that he did not know that the deceased was an officer. The deceased and James Buchanan and Alonzo W. Letts were standing on the north side of Twelfth street, between Bloomfield and Garden, about fifty feet west of Bloomfield street. These witnesses testified that they saw the prisoner on the north side on the corner, standing on Bloomfield street, about five feet from the crosswalk, looking up and down the street. Letts said the deceased was talking to him, and the prisoner turned and went up

Bloomfield street and entered the flat-house on the northeast corner, entered the vestibule and pulled the door behind him; that the deceased went in there and pulled the man from behind the door, and spoke to him; that it seemed to him that the deceased was showing his badge; he rested his hand on the lapel of his coat. Then they came out of the house and together turned up towards Washington street, the prisoner pointing to Washington street. That there was in the conduct of the prisoner that which had excited the suspicion of the officer is apparent from the testimony of the prisoner himself. He testifies that he saw the two men talking, and he thought it very peculiar that they should watch him, and that he thought he had better go in the first doorway he saw and see whether they would follow him any further.

It is also apparent from the prisoner's statement at the police office that the deceased in fact had arrested him, and that the shooting by the prisoner was for the purpose of effecting an escape. At common law a peace officer has a right to arrest without warrant one whom he suspects to be guilty of felony, although it afterwards appears that no felony was committed, provided he has reasonable cause to suspect that the person arrested has committed a felony. There is this distinction between a private individual and a constable: in order to justify the former in causing the imprisonment of a person, he must not only make out a reasonable ground of suspicion, but he must prove that a felony was actually committed; whereas a constable having reasonable ground to suspect that a felony has been committed is authorized to detain the party suspected until inquiry can be made by the proper authorities. *Reuck* v. *McGregor*, 3 *Vroom* 70, 74; *Beckwith* v. *Philby et al.*, 6 *Barn. & C.* 635; *Clark Cr. Pro.* § 12; 1 *Lead. Cr. Cas.* 197, 202. The distinction between felonies and misdemeanors is not observed in our criminal code. Statutory offences if designated at all are called misdemeanors or high misdemeanors. *Jackson* v. *State*, 20 *Vroom* 255. The grade of the offence in our criminal code is determined by the character and degree of the punishment pre-

scribed, rather than upon the common law classification of felonies and misdemeanors.

By statute it is made a high misdemeanor, punishable by imprisonment in the state prison for a term not exceeding seven years, if any person shall by day or by night willfully or maliciously break or enter into any dwelling-house, or enter by day or night without breaking any dwelling-house, &c., with intent to steal. *Pamph. L.* 1898, *p.* 830, §§ 131, 132, 133. By another section an attempt to commit any of the offences mentioned in the act, or any offence of an indictable nature at common law, though such offence was not actually committed, is made a misdemeanor punishable by imprisonment in the state prison at hard labor for a term not exceeding three years, &c. *Pamph. L.* 1898, *p.* 854, § 216. By another section it is made a high misdemeanor punishable by imprisonment in the state prison for a term not exceeding seven years, for a person to have in his possession any tool or implement adapted or designed for cutting through, forcing or breaking open any building, &c., knowing the same to be adapted or designed as aforesaid, with intent to use or employ or allow the same to be used or employed for that purpose. *Pamph. L.* 1898, *p.* 830, § 134.

A person engaged in the commission of the crimes referred to in the sections of the Crimes act above mentioned would, under the rules of the common law, be liable to arrest by an officer without process, and a person having in his possession the implements found in the possession of the accused, with the intent to break into any building, &c., would be liable to arrest by an officer without process. The prisoner testified that he had no intent to break into the house; that he entered the vestibule to escape, because he had in his possession the burglars' tools that he had brought over to Hoboken—not for any criminal purpose, but to get rid of them. But the accused in the police court was found in the possession of the tools of a burglar or sneak-thief; his conduct in going into the flat was suspicious, and the officer, if he had no knowledge of the antecedents of the accused, had no knowledge of his

purpose in going there, and if, acting on his own view of the conduct of the prisoner, he had reasonable grounds to suspect the prisoner's object in going into the vestibule and pulling the door behind him was to commit a criminal offence, he had a right, and it was his duty, to arrest him without process; and the trial court submitted that question as a question of fact for the jury.

By section 2 of the act concerning disorderly persons, any person having upon him any pick-lock, key, crow, jack, bitt or other implement, with intent to break into any building, * * * or who shall be found in or near any dwelling-house, &c., with intent to steal any goods and chattels, shall be deemed and adjudged to be a disorderly person, and by section 36 it is made the duty of every constable or other police officer, and lawful for any person, to apprehend without warrant or process any disorderly person and take him before any magistrate of the county where he shall be apprehended. *Pamph. L.* 1898, *pp.* 942, 953. The learned judge, in his charge, excluded from the consideration of the jury these provisions of the Disorderly act and presented the right of a peace officer to arrest without process under the provisions of the Crimes act exclusively. The right of a peace officer to arrest without process under the Disorderly act is of great importance in the maintenance of public peace, especially in the large cities. In *Mayor, &c., of Newark* v. *Murphy,* 11 *Vroom* 145, 150, Mr. Justice Reed, speaking of the authority to arrest summarily, says : " In this state, by the act concerning disorderly persons, it has been extended to a class of cases which would seem to include almost every instance where the police regulation of any municipality would require speedy treatment." The right of arrest under that statute is referred to that it may not be inferred that, in the judgment of this court, it is to be excluded in the consideration of cases of this kind.

In Mackalley's case, which was an indictment for murder in killing a police officer in making an arrest, " it was resolved that if any magistrate or minister of justice, in execu-

tion of his office or in keeping of the peace according to the duty of his office, be killed it is murder," and the reason given is that "it is true that the life of a man is much favored in law, but the life of the law itself (which protects all in peace and safety) ought to be more favored, and the execution of the process of law and of the officers and conservators of the peace is the life of the law and the means by which justice is administered and the peace of the realm kept." 9 Co. 68. The offence of killing an officer in the performance of his duty is provided for by the statute which enacts that "if any person or persons shall kill any judge, magistrate, sheriff, coroner, constable or other officer of justice, either civil or criminal, of this state, * * * in the execution of his office or duty, or shall kill any assistant, whether specially called in aid or not, endeavoring to preserve the peace or to apprehend a criminal, knowing the authority of such assistant, or shall kill a private person endeavoring 'to suppress an affray or to apprehend a criminal, knowing the intention with which such private person interposes, then such person so killing as aforesaid shall be guilty of murder." *Pamph. L.* 1898, *p.* 824, § 106. It is only where the homicide is of an assistant when aiding an officer in the endeavor to preserve the peace or to apprehend a criminal, or a private person interposing to suppress an affray or to apprehend a criminal, that knowledge of the authority of such assistant or of the intention with which the private person interferes is necessary to bring the case within the provision of this statute. The deceased was lawfully in the execution of his office and within the protection of the statute. Unless the act of killing is justified or mitigated to a less grade of crime, the accused, by force of this statute, was guilty of murder.

The instruction of the learned judge was that the police officer, having the same powers as a constable or sheriff in this respect under the common law, is justified in making arrest without warrant provided he acts in good faith upon such facts and circumstances as amount to a reasonable and proper ground for suspicion. "If he has reasonable cause

to suspect that a felony has been actually committed he is justified in arresting the parties suspected, although it afterwards appear that no felony has been committed, and whether his judgment was a proper judgment or not must be left to the jury. * * * He could also arrest an offender without warrant for treason, felony, breach of the peace and some misdemeanors when committed in his view or if there existed facts which gave rise to the reasonable judgment to suspect the person arrested to be the guilty party. If these were the circumstances there the defendant could not complain of his arrest and could not resist it." The judge, on this subject, further instructed the jury: "Was the accused subject to arrest for any of these supposed crimes? If so, no person could know it any better than he. If the facts were such as to give rise to a reasonable suspicion no one knew it better than he, and if he was thus subject to arrest, if in resisting arrest or in his endeavor to escape arrest he killed the officer without the necessity of self-defence, it would be murder of one degree or the other, depending upon whether he deliberately intended to take the life of the officer or only to do grave bodily harm. I have said that in order to render the arrest lawful by the officer it was not necessary that he be guilty of either of the offences charged against him. The arrest would be lawful even though he might be innocent. The prisoner could not adjudge for himself whether the facts and circumstances were such as would justify his arrest. The main question for you to determine here is whether he had created facts and circumstances which would give rise to the right to make the arrest—that is, give rise in the judgment of the officer of a reasonable cause to suspect him of being guilty." The instruction of the learned judge on this head, in giving effect to the statute referred to, was correct.

The judge instructed the jury that if the act of killing was not excusable or justifiable on the ground of self-defence and was not reduced to manslaughter, then it would be murder of the first or second degree; the act of killing being established, the presumption was that it was murder of the second

degree. " If the defendant seeks to reduce it to a lower degree of homicide he must establish that by the evidence in your minds to your satisfaction, and if the state demands a verdict of murder of the first degree the burden is upon the state to establish it beyond reasonable doubt." Murder is, by the one hundred and seventh section of the Crimes act (*Pamph. L.* 1898, *p.* 824, § 107), classified into two degrees—murder of the first degree and murder of the second degree. That section enacts that all murder which shall be perpetrated by means of poison or lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in perpetrating or attempting to perpetrate certain specified crimes, shall be murder of the first degree, and that all other kinds of murder shall be murder of the second degree. The legislature, in declaring what shall constitute murder of the first degree and what murder of the second degree, created no new crimes but merely made a distinction with a view to the difference in the punishment. *Graves* v. *State,* 16 *Vroom* 347, 358. The act of killing being such as, at common law or under the statute, would amount to murder, the judge properly charged the jury that the presumption was of murder of the second degree, and that if the state proposed to raise the degree of criminal responsibility to that of murder of the first degree it must accept the burden of proving beyond a reasonable doubt that the killing was such as, by the section just referred to, would constitute murder of the first degree. In defining the essential qualities of murder of the first degree the learned judge quoted and adopted the language of the court in *Donnelly* v. *State,* 2 *Dutcher* 463, 509, 510.

The contention at the trial was that the killing of the officer was justified on the ground of self-defence. The evidence showed that the prisoner and the deceased came down the steps together and proceeded into Twelfth street on the south side, where a struggle ensued between them ; that after they had broken away from each other, or the prisoner had broken away from the officer, the prisoner, in backing off or getting

away, with the deceased following him, fired three pistol shots at the deceased, one after the other, two of the three shots taking effect in the body of the deceased. The witnesses describe the two men as wrestling, scuffling, fighting; that the prisoner had a pistol and that the deceased was endeavoring to get it from him; that the prisoner was backing away from the officer and ran two or three feet and stopped and turned around; the deceased was after him as if he wanted to catch him; that as the deceased was approaching the prisoner, the prisoner pulled out the pistol and fired once; then the prisoner turned and ran away again, the deceased still pursuing him, and then the prisoner again shot; the officer was also armed with a pistol, which he had in his hand; that he attempted to fire his pistol, but for some reason or other his pistol was not discharged.

The statement of the prisoner at the police court is important on this subject. He says that when the officer came to him and said to him, "What are you doing?" he answered, "I expect to find a friend;" the officer asked, "Who is this with you?" that the prisoner answered, "A friend of mine; the reason I answered him this way was to get him to walk a block or so to allay his suspicion; I then attempted to run away from him; he arrested me."

"*Q.* Then you are trying to make us believe that you killed him in self-defence?"

"*A.* I do not; I wanted to escape only; I could not get away; I looked back and saw him with what I supposed was his revolver; I drew my pistol and said to him, 'Go 'way from me;' he still followed me; I thought he was going to shoot; I pointed my revolver with the intention of frightening him away; I then fired at him three times; each shot took an effect."

The instructions of the trial court on this subject were: "Taking life in the course of the necessary defence of one's person is a legal defence upon an indictment of this kind, but the law, from the highest considerations of public policy, circumscribes the right of one person to take the life of another

within narrow limits and allows it to be exercised only under extraordinary circumstances. The burden of proof of self-defence is upon the prisoner. He must show to the satisfaction of the jury a situation and circumstances under which that right may be lawfully exercised, and before his defence is complete those facts and circumstances must appear to bring the act done by the prisoner within the prescribed limits. The weapon that was used here was one capable of producing either death or grave bodily harm. The shots were delivered upon a vital part of the officer's body and resulted in immediate death. The question for the decision of the jury is upon this matter—whether this act of the prisoner was an act in the lawful defence of his person. To make his defence available the justification must be co-extensive with the act intended to be done, and the character of the weapon used, the place where the shot was delivered and the circumstances under which it was delivered are all to be borne in mind in passing judgment upon the defence of self-defence set up in this case. Did he kill here in self-defence of himself, to prevent his own life being taken or to prevent grave bodily harm arising to him by reason of the conduct of the officer in making the arrest, or did he do grave bodily injury with the intent of escaping arrest? To kill to escape arrest is not self-defence. The foundation of the right to take life by the way of self-defence is necessity. There must exist a necessity for resorting to violence for self-protection and necessity for using the means that were used to secure the defence of the person. An accused is justified in using force to defend his person only when force is necessary to accomplish that end. If the injury apprehended could be otherwise avoided the prisoner was bound to avoid the danger without resorting to violence, and even if the circumstances be such as to require the use of force to repel the assault he will be inexcusable if he carried his defence beyond the bounds of necessity. The danger must be immediate, and must be actual or else apprehended on reasonable grounds, of which the jury is to judge. The accused could not make his judgment of the necessity of slaying the deceased in order to

defend himself a justification of his act.    Whether the neces-
sity for taking life existed must be determined from the situa-
tion of the accused at the time, and it is the province and
duty of the jury to determine that question.    Now, the facts
of the shooting are taken by you.    Was the officer here by
any action of his own, making this arrest, putting the life of
the prisoner in danger, or doing that which would cause him
grave bodily injury, or was any of his acts in making the
arrest such as to warrant an apprehension in the prisoner's
mind that his life was in danger, or that grave bodily harm
would come to him unless he used the pistol upon the officer
and which demanded of him the act of slaying the officer in
order to protect his body from such danger?    If the arrest
was a lawful one the officer had a right to use the force neces-
sary to render the arrest effective, and if the prisoner, by his
resistance to the arrest, brought violence upon himself, which
put his body in danger, that cannot be made justification for
killing the officer.    His duty, the arrest being lawful, was to
submit to arrest if made with the use of no unnecessary force,
and if his resistance caused force to be applied, he cannot
complain that sufficient force was used to render the arrest
effective."

The errors assigned on that part of the charge are—first,
with respect to the instruction that the burden of proof of
self-defence is on the prisoner ; that he must show to the satis-
faction of the jury a situation and circumstances under which
the right of self-defence could be lawfully exercised, and
before his defence is complete those facts and circumstances
must appear to bring the act done by the prisoner within the
prescribed limits; second, the instruction that "to kill to
escape arrest is not self-defence ;" and third, that the accused
could not make his judgment of the necessity of slaying the
deceased in order to defend himself a justification of his act—
that it was the province of the jury to determine that question.

"In every charge of murder, the fact of killing being first
proven, all the circumstances of action, necessity or infirmity
are to be *satisfactorily proven by the prisoner*, unless they arise

out of the evidence produced against him; for the law pre-
sumeth the fact to have been founded in malice until the
contrary appear. " The matters tending to justify, excuse or
alleviate *must appear in evidence* before he can avail himself
of them." *Fost.* 255.   Mr. Justice Blackstone, speaking of
acts justifying a homicide or excusing it or mitigating it to
manslaughter, says: "All these circumstances of justification,
excuse or alleviation, it is *incumbent upon the prisoner to make
out to the satisfaction of the court and jury; the latter of whom
is to decide whether the circumstances alleged are proved to have
actually existed, the former how far they extend to take away or
mitigate guilt; for all homicide is presumed to be malicious
until the contrary appeareth in evidence.*"   4 *Bl. Com.* 201.
" On every charge of murder, the fact of killing being first
proved, the law presumes it to have been founded in malice
*until the contrary appear;* and, therefore, all circumstances
alleged by way of justification, excuse or alleviation *must be
proved by the prisoner,* unless they arise out of the evidence
against him."   1 *East P. C.* 340.   " Besides the presumptions
which a jury may make from circumstantial evidence, there
are also presumptions of law.   Thus in every charge of murder,
the fact of killing being first proved, *the law presumes it to
have been founded on malice till the contrary appear;* therefore,
all circumstances alleged by way of justification, excuse or
alleviation *must be proved by the prisoner,* unless they arise
out of the evidence produced against him."   3 *Russ. Cr.* (6th
*ed.*) 360.   This doctrine was declared to be the law in this
state as early as *State* v. *Zellers,* 2 *Halst.* 220, 243.   The dis-
tinction is between the burden of proof in the order of the
trial of the issues arising in the case, and the effect of evidence
offered either by the state or by the accused, to which the
doctrine of reasonable doubt is applied.   It would be a novelty
in the trial of criminal cases to require the state to disprove
affirmatively beyond a reasonable doubt every defence that
possibly might be made.   Mr. Wharton says: " We frequently
hear that after a *prima facie* case on one side the burden of
proof is shifted to the other side; and this shifting of the

burden of proof, which no doubt takes place after a *prima facie* case, is sometimes confounded with the question of the degree of proof necessary to a verdict. The questions are entirely separate. A defendant may often have the burden of proof imposed on him. But when the case goes to the jury, there is no essential element in his guilt which must not appear to be proved beyond reasonable doubt." *Whart. Hom.*, § 647. The trial court so dealt with this subject, and, while holding that the burden of proof of the situation and circumstances under which the right of self-defence might lawfully be exercised was on the prisoner, instructed the jury that " the benefit of the reasonable doubt always goes to the defendant and always is applied in his favor. He is never presumed to be any more guilty than the facts make him, and your conclusion of guilt must be beyond reasonable doubt in order to convict." The full instructions of the trial judge on the subject of reasonable doubt as applicable to the entire case will be stated hereafter.

There is a broad distinction between the obligation to make proof of facts and circumstances upon which a particular defence rests and the effect of such evidence upon the ultimate issue of the trial. In a civil suit for an assault and battery a justification of *son assault*, &c., must be pleaded, and at the trial the burden is on the defendant to prove a justification by way of self-defence commensurate with his assault upon the plaintiff. The feature that distinguishes a criminal prosecution from a civil suit arising out of the same transaction is that in the latter the burden of proving a justification is throughout upon the defendant, but in the criminal prosecution, after the facts are proved which give occasion for self-defence, the accused is entitled to the benefit of a reasonable doubt with respect to his guilt upon the whole case. In such a prosecution, if no facts are shown which would in law give occasion for self-defence, a justification on that ground will disappear from the case; but if such facts are shown to the satisfaction of the jury, then the jury make their deductions and inferences therefrom, and the issue of the guilt or inno-

cence of the accused is to be determined upon the whole case, according to the accused the benefit of a reasonable doubt which inheres in a criminal prosecution. In some of the cases the doctrine that the burden of proof is ever on the accused where self-defence is interposed as a justification is said to be inconsistent with the presumption of innocence. This is an assumption that is in fact unfounded. The presumption of innocence that first arises is that the deceased has done nothing that justified the accused in taking his life, and that presumption continues until overcome by evidence. It would be illogical as well as unjust to affix upon the conduct of the deceased the imputation of criminality, which, in the absence of evidence to the contrary, would make the killing justifiable. When a homicide is committed it would shock a sense of justice to assert, without knowledge of the circumstances, that the man who was killed deserved death; and yet the presumption asserted in favor of a prisoner that he has no burden of proof in connection with a justification of that character, amounts in substance to the same thing. The accused can have no cause of complaint if on the trial of the indictment he is required to lay before the court the facts which prompted or induced his acts, if he be accorded the benefit of a reasonable doubt with respect to his guilt or innocence upon the whole case.

The case cited as the leading case against this view is *Stokes* v. *People,* 53 *N. Y.* 164. I do not understand the decision of that case to controvert the rule of the common law with respect to the presumption arising from the act of killing. The justification in that case was by way of self-defence, and the charge of the trial court, which was held to be erroneous, was that " the fact of killing being conceded and the law implying motive from the circumstances of the case, the prosecutor's case is fully and entirely made out, and *therefore you can have no reasonable doubt as to that, unless the prisoner shall give evidence sufficient to satisfy you that it was justified under the circumstances of the case.*" The trial judge in his instructions also charged that " ordinarily, natu-

rally and properly in cases of this kind juries are disposed to and should give the prisoner the benefit of any reasonable doubt that may exist in the case, and I do not know that even this is an exception to that rule. If the evidence shall be doubtful upon that subject, if you should entertain reasonable doubts, if the evidence is evenly balanced, so that you do not know where the truth lies, the prisoner would be entitled to the benefit of that doubt."

The learned judge who delivered the opinion of the Court of Appeals of New York, in commenting on this instruction, said (at *p.* 178) that "the benefit of the doubt to be given to the prisoner should not have been restricted to their finding of the evidence evenly balanced, so that they did not know where the truth lay; on the contrary, the instruction would have been not to convict of that crime unless convinced by all the evidence in the case that he was guilty, and that if a careful examination of all the evidence left in their minds reasonable doubt of his guilt, they should give the prisoner the benefit of an acquittal. This instruction was warranted by the common law of England." The learned judge adds: "But the question in this case is not what was the rule of the common law as to the implication of malice from the act, whether such rule is deduced from authority or principle and legal analogy. The question arises upon the statute of the state by which homicide is made justifiable or excusable, murder in the first or second degree, or manslaughter in one of four degrees, determinable by the intention and circumstances of its perpetration. Under the statute it is obvious that mere proof that one has been deprived of life by the act of another utterly fails to show the class of the homicide under the statute." The court did not overrule or even cite the earlier case (*People* v. *Schryver*, 42 *N. Y.* 1), in which it was held on an indictment for manslaughter, where it was claimed that the killing was done in self-defence, that on such a claim of justification the accused must take upon himself the burden of satisfying the jury by a preponderance of evidence, and

must produce the same degree of proof that would be required if the blow inflicted had not ensued in death and he had been indicted for assult and battery and had set up a justification.

It may be inferred from the fact that in the Stokes case People *v.* Schryver was not overruled, as well as from the language of the judge in pronouncing the judgment, that that decision was placed upon the statute and not upon the common law. Other authorities in elucidation of the principle that the burden is on the accused of proving the facts and circumstances upon which justification or mitigation rests will be cited in considering another branch of this case.

At the close of the evidence on the part of the state, and upon the proof adduced at that stage, there was no ground on which justification by way of self-defence could be rested. The defence, if permissible at all, arose from the testimony of the defendant himself. The charge of the judge, that the burden was on the accused to prove the facts and circumstances necessary for such a defence, was in accordance with the doctrines of the common law, which at an early period of our judicial history were adopted, and have been recognized as the law without dissent, it is believed, down to the present time.

The instructions with respect to the circumstances under which an accused is justified in resorting to self-defence with the weapon that was used were correct. "The right of self-defence has always been regarded as founded on necessity and is in no case permitted to extend beyond the actual continuance of that necessity, by which alone it is warranted." 1 *East P. C.* 271, 278. "Before a person can avail himself of the defence that he used a weapon in defence of his life he must satisfy the jury that that defence was necessary to protect his own life or to protect himself from such serious bodily harm as would give him a reasonable apprehension that his life was in immediate danger." 3 *Russ.* 208. And again, "It should further be observed, as the excuse of self-defence is founded on necessity, it can in no case extend beyond the

actual continuance of that necessity, by which alone it is warranted." *Id.* 211, 212; 1 *East P. C.* 293; *Fost.* 273, 279. In State *v.* Wells, which was an indictment for murder on a defence that the killing was done by way of self-defence and a conviction of murder, the Supreme Court held that "no man is justified or excusable in taking the life of another unless the necessity for so doing is apparent as the only means of avoiding his own destruction or some great injury." *Coxe* 424.

Justification for taking life by the use of a deadly weapon results from the situation of the accused at the time the fatal wound was given. Whether his situation was such as to warrant resort to such means to protect himself from a danger actual or apprehended on reasonable grounds, and whether, before the fatal wound was given, the accused had done everything exacted by the law to avoid taking life, involve the determination of questions of fact. The accused cannot make his own judgment of the necessity of slaying the deceased his justification. The judge properly instructed the jury that whether the necessity for taking life existed must be determined from the situation of the accused at the time and that it was the province of the jury to determine that question.

Whether the arrest of the prisoner by the deceased was lawful, was correctly submitted to the jury. If, in the finding of the jury, the arrest was lawful, it would be superfluous to discuss the question whether it would be justifiable in the accused to kill the officer in order to effect an escape.

The instructions of the trial judge with respect to manslaughter are also under exception on which errors have been assigned. The trial judge instructed the jury that the killing being established the presumption was that it was murder of the second degree, and that " if the defendant desired to reduce it to a lower degree of homicide he must establish that by the evidence in your minds to your satisfaction."

Citation has already been made of some of the common law authorities with respect to the presumption from the act of killing and the burden of proof on the questions of justification and mitigation. A reference to a few of the leading

cases and authorities more particularly applicable to a miti-
gation of the offence to manslaughter will be made.   Mac-
kalley's case, which has already been cited, was an indict-
ment for murder in killing a police officer who had arrested
and had another in custody.   The case was heard *in banc* on
a special verdict before all the judges of England.   "It was
resolved if one kills another without provocation and with-
out malice prepense *which can be proved,* the law adjudges it
murder and implies malice,   *   *   *   and therefore when
he kills one without provocation the law implies malice, and
in both these cases they may be indicted generally that they
killed of malice prepense, for malice implied by law given in
evidence is sufficient to maintain the general indictment."
In *Legge's Case, Kel.* 27, the accused was indicted for the
murder of R. W.   It was held by the court that "it was
upon evidence agreed that if one kill another and no sudden
quarrel appeareth, this is murder, as in Mackalley's case, and
it lieth on the party indicted *to prove the sudden quarrel."*
These principles were adopted in *Rex* v. *Oneby,* 2 Ld. *Raym.*
1485 ; *S. C.,* 2 *Str.* 766.   Chief Justice Raymond, in giving
answers to the objections which were made on behalf of the
prisoner, and which had been duly weighed and considered
by the court, said : " One objection to the verdict was that
the homicide was upon a sudden quarrel, and so but man-
slaughter, whereupon the court stated the rule thus : ' In
answer to this objection I must first take notice that *when a
man is killed the law will not presume that it is upon a sudden
quarrel unless it is proved to be,* and therefore, in Legge's case,
it was agreed upon evidence that if A kills B, and no sudden
quarrel appears, it.is murder, *for it lies upon the party in-
dicted to prove the sudden quarrel.'* "   In 1 *Hawk. P. C., ch.*
31, § 32, it is laid down that " wherever it appears that a
man killeth another, it shall be intended *prima facie* that he
did it maliciously, unless *he can make out to the contrary by
showing that he did it on sudden provocation,"* &c.

The general doctrine of the law as stated in the latest
edition of Russell is that " whenever death ensues from the

sudden transport of passion or heat of blood upon a reasonable provocation, and without malice, it is considered as solely imputable to human infirmity, and the offence will be manslaughter. It should be remembered that the *person sheltering himself under this plea of provocation must make out the circumstances of alleviation to the satisfaction of the court and jury,* unless they arise out of the evidence produced against him; as the presumption of law deems all homicide to be malicious until the contrary is proved." 3 *Russ.* 172. Citations to the same effect from Foster, Blackstone and East have already been made, and it is believed that this principle is sustained by the English text-books and decisions without any qualification or dissent. It was adopted in this state in *Zeller's Case,* 2 *Halst.* 243.

In *Commonwealth* v. *York,* 9 *Metc.* 93, a case which has been considered as the leading case in this country, it was held that " on a trial for murder, if the killing be proved to have been done by a wound willfully inflicted with a deadly weapon upon a vital part with great violence, and *nothing further is shown,* the presumption of law is that it was malicious and an act of murder. The proof of excuse or extenuation lies on the defendant, which may appear either from evidence adduced by the prosecution or from evidence offered by the defendant." In that case it was held that it was not only incumbent on the defendant to make proof of the matter of excuse or extenuation, but that the proof must be by a preponderance of evidence sufficient to satisfy the jury of the fact, and that the accused was not entitled to a verdict though there should be a reasonable doubt of the fact of extenuation. Commonwealth *v.* York was followed in *Commonwealth* v. *Webster,* 5 *Cush.* 295. In both of these cases the opinion was delivered by Chief Justice Shaw. In a later case (*Commonwealth* v. *Hawkins,* 3 *Gray* 463), which was an indictment for murder tried before the same Chief Justice and Justices Metcalf and Bigelow, the contention was that the offence was mitigated to manslaughter. The evidence was that the parties were under the influence of liquor, and after

insulting words had fought with fists, and that while they were fighting the deceased was stabbed with a knife. All the evidence in the case was produced on the part of the commonwealth; no evidence was offered on the part of the accused. The Chief Justice at the close of the trial remarked that the doctrine of York's case was that where the killing is proved to have been committed by the defendant, and *nothing further is shown*, the presumption of law is that it was malicious and an act of murder, and that this was inapplicable to the present case, where the circumstances attending the homicide were fully shown by the evidence. On this point the Chief Justice instructed the jury as follows: "The murder charged must be proved. The burden of proof is on the commonwealth to prove the case. *All the evidence on both sides which the jury finds to be true is to be taken into consideration; and if, the homicide being conceded, no excuse or justification is shown*, it is either murder or manslaughter; and if the jury under all the circumstances are satisfied beyond a reasonable doubt that it was done with malice, they will return a verdict of murder; otherwise they will find the defendant guilty of manslaughter." It may be observed that there is in substance and effect little difference between the instructions of the Massachusetts court in the Hawkins case and the charge of the judge in this case, taking the whole charge together—the instructions as to the burden of proof and his directions with respect to the effect of reasonable doubt in the trial of a case.

With respect to the conditions under which a homicide may be mitigated to manslaughter, on the contention that the act of killing was done in the heat of blood or in a sudden transport of passion, the learned judge instructed the jury as follows: "The object of the law is to have passion controlled and subdued and not permit it to become the excuse or palliation of crime. To mitigate the offence to manslaughter the facts must show that the act was done in the excitement of passion; it must appear that the killing resulted from passion or heat of blood produced by a reasonable provocation. It is

not every provocation that will reduce a killing from murder to manslaughter. The provocation must be of such a character and so close upon the act of killing that, for the moment, the prisoner could be considered as not master of his own understanding. If such an interval of time elapsed between the provocation and the act of killing as is reasonably sufficient for reason to resume its sway, the offence is not mitigated to manslaughter. I have said the provocation must be reasonable and must be recent, and the act of killing must be done in a sudden transport of passion. Whether the provocation was reasonable and whether sufficient time elapsed between the provocation given and the act of killing for the accused to subdue or control his passion are questions of fact to be determined by the jury on a consideration of the circumstances of the particular case before them." These instructions in all respects conform to legal rules and principles which apply to and control the issue involved in this branch of the cause. 2 *Rosc. Cr. Ev.* 772, 781.

As the case stood when the state rested, the proof was of an arrest by a police officer on reasonable grounds and the shooting by the accused in the effort to escape. On his examination as a witness the prisoner testified that his object in going into the vestibule was an innocent object, and that he did not know that the deceased was an officer. The charge of the trial judge on this subject was as follows: " The prisoner contends here that the arrest was unlawful, and if unlawful it was the reasonable provocation of hot blood or sudden passion in the prisoner resisting the arrest; he having no notice of the official character of the deceased, and having no notice of it, he killed the deceased, and therefore his act of killing would be only manslaughter. If the arrest was unlawful in the sense I have defined—that is, that no crime had been committed by him, or that the officer had no reasonable cause to suspect him of being guilty of a crime—then it was unlawful; and if it was unlawful in this sense—that is, an arrest where no crime had been committed, or that the officer had no reasonable cause for it—and the defendant had no notice

or knowledge of the official character of the person making the arrest, and thereupon the arrest being made, hot blood or sudden passion was evolved or created in the mind of the defendant, and in that hot blood or sudden passion the shooting was done, the offence would be manslaughter only, and not murder of either degree; but the same questions of fact still remain—was the arrest unlawful, or did the prisoner have notice of the official character of the person making the arrest? If the prisoner knew the person arresting him, knew him to be an officer, and he had committed a crime which the officer had reasonable grounds to suspect him to be guilty of, the law does not permit the arrest to be a provocation sufficient to reduce the killing to manslaughter."

These instructions are quite as favorable to the prisoner as he had any right to require. Nor has the prisoner any cause of complaint that he was not accorded by the trial judge the benefit of a reasonable doubt to the full extent. Near the commencement of the charge the learned judge used this language: "In this case, once for all, you can remember it and apply the principle as you go along in the investigation of the case, that the prisoner at the bar, when put upon his trial under this indictment, is presumed to be innocent, and his guilt, whatever phase it may take in your minds, whatever your conclusions from the facts may be, must be established in your mind and in your judgment beyond reasonable doubt, before you can convict. If in this case there should arise any reasonable doubt as to the guilt or innocence of the defendant generally upon this indictment and under this evidence, your duty would be to acquit him of any offence. If in considering this case and applying the principles of law which will be given to you by the court, you should be clear and find beyond reasonable doubt that guilt has been established, but you should be in that state of mind which is called reasonable doubt as to whether his guilt was that of manslaughter or of murder of either of the degrees, the benefit of that reasonable doubt would go to the prisoner, and you would find him guilty of the lesser degree of homicide; that is, manslaughter. If it

should be established to your minds beyond reasonable doubt that the defendant was guilty of the offence of murder, and you should be in that state of reasonable doubt as to whether it is murder of the first degree or of the second degree, you would, under the law, be bound to convict of murder of the second degree only, and you would convict of murder of the first degree only when, under the law and under the facts, that degree is established beyond reasonable doubt." And in defining reasonable doubt the judge used the expression that " it is the doubt which makes you hesitate as to the correctness of the conclusion which you reach. If, under your oaths and upon your consciences, after you have fully investigated the evidence and compared it in all its parts, you say to yourself, ' I doubt if he is guilty,' then that is reasonable doubt; it is a doubt which settles in your judgment and finds a resting place there." The learned judge then closed his directions as to reasonable doubt in this emphatic language : " The benefit of the reasonable doubt always goes to the defendant and always is applied in his favor. He is never presumed to be any more guilty than the facts make him, and your conclusion of guilt must be beyond reasonable doubt in order to convict." The court, having instructed the jury upon the effect of reasonable doubt in language comprehending every issue in the case, was not obliged to reiterate it and apply it specifically to every such issue. *Warner* v. *State,* 27 *Vroom* 686, 688.

The charge of the court must be considered with reference to the case as it was made. The fair import of the judge's instruction taken as a whole is that the obligation rests primarily on the accused of proving such facts and circumstances as in law may justify the homicide or mitigate the offence to manslaughter, submitting to the jury the issue of the guilt or innocence of the accused upon all the evidence in the case, and according to the accused the benefit of a reasonable doubt, which the learned judge declared " always goes to the defendant and always is applied in his favor." The charge in these respects is sustained by the entire body of

common law precedents, and, I may add, by all the reported decisions in this state.

The other exceptions and assignments of error have been examined. Finding no error upon the record, the judgment should be affirmed.

DIXON, J. (dissenting).    The plaintiff in error having been convicted of murder in the first degree, contends that his constitutional rights were infringed by trying him before a struck jury—that is, a jury drawn from among the persons named on a panel selected by a judge, from which panel the state and the prisoner had struck an equal number of names.

The constitutional prescriptions are these: "The right of trial by jury shall remain inviolate," and "in all criminal prosecutions the accused shall have the right to a speedy and public trial by an impartial jury."

I have been unable to find any reason for thinking that the procedure mentioned runs counter to these constitutional injunctions.

But according to our statute, in cases tried before struck juries, accused persons are entitled to only five peremptory challenges, while at the time of the adoption of our constitution persons accused of certain high crimes, among them murder, were entitled to twenty peremptory challenges. This feature of the statute I deem unconstitutional.

The right of the accused to challenge peremptorily, on being confronted with the proposed juror immediately before the trial, I regard as a very important means of securing to him what the constitution guarantees—an impartial jury. The accused may know of a bias, the grounds of which he cannot prove or dare not disclose, or he may create a bias by an unsuccessful attempt to support a challenge for cause, and in any of these circumstances his sole resort is to a peremptory challenge. The evident utility and importance of this right, in order to insure the attainment of the constitutional aim— trial by an impartial jury—justify the conclusion that, so far as the right existed when the constitution was framed, it is

within the guaranty of that instrument.   And if the right of peremptory challenge be thus guaranteed at all, the most reasonable and the safest inference is that it is guaranteed to the same extent as it then had.

I am therefore of opinion that a person on trial for any of these high crimes is entitled to twenty peremptory challenges, to be presented when the accused and the proposed juror are brought face to face immediately before the trial.

The present record, however, does not show that this right was denied to the plaintiff in error, for his specific objection was only to a struck jury, and every peremptory challenge interposed by him was allowed.   On this ground a reversal of the judgment could scarcely be demanded.

But I think there were, in the charge of the judge to the jury, errors which require reversal.

The undisputed facts established by the evidence were that the prisoner shot and killed Charles Gebhardt, in the city of Hoboken ; that Gebhardt was a policeman of the city, and at the time of the homicide was arresting the prisoner withou a warrant.   The matters in dispute on the evidence were whether the prisoner had notice that Gebhardt, then in the dress of a private citizen, was a policeman ; whether there existed any legal cause for the prisoner's arrest, and whether, when the prisoner fired the fatal shots, Gebhardt had a pistol aimed at the prisoner, as if about to shoot him.

Under these circumstances the judge instructed the jury as follows: " If you find that the act of killing Gebhardt was the act of the prisoner at the bar (and of that there is no dispute here ; that fact is conceded by the evidence and by the counsel in the trial of the case), the presumption arises, notwithstanding the person slain was an officer of the law and notwithstanding this killing grew out of an attempt to make an arrest—the killing having been established as that of the defendant—that the degree of the offence is murder of the second degree only.   That presumption of law existing, the burden is then on the prisoner to mitigate that degree of guilt from murder of the second degree to manslaughter, that

burden rests upon him to take the offence away from the
effect of the presumption just stated and by evidence reduce
the killing to manslaughter.   *   *   *   The killing being
established, it is murder of the second degree, and if the
defendant desires to reduce it to a lower degree of homicide
he must establish that by the evidence, in your minds, to
your satisfaction."

The charge further declared as follows: "The burden of
proof of self-defence is upon the prisoner.   He must show to
the satisfaction of the jury, a situation and circumstances
under which the right may be lawfully exercised, and before
his defence is complete those facts and circumstances must
appear to bring the act done by the prisoner within the pre-
scribed limits."

These instructions, I think, clearly deprived the prisoner
of the benefit of the principle that an accused person shall not
be convicted of any offence unless his guilt thereof be proved
beyond reasonable doubt.   For, if the evidence raised in the
minds of the jurors reasonable doubt whether the facts existed
on which the homicide would be manslaughter only, but did
not *establish such facts in the minds of the jurors to their satis-
faction,* then as between murder and manslaughter the jury
must, according to these instructions, convict the prisoner of
murder; and if the evidence raised in their minds reasonable
doubt whether the situation and circumstances were such as
made the homicide excusable because committed in self-defence,
but did not *show such situation and circumstances to the satis-
faction of the jury,* then as between a conviction of murder
and an acquittal on the ground of self-defence, the jury must,
according to these instructions, convict.   Yet in either of
these conditions of proof, the jury would be convicting the
prisoner of murder when the whole evidence created in their
minds reasonable doubt whether he was guilty of murder.
Such a conviction would be in violation of the fundamental
principle of our criminal jurisprudence.

I think it plain that in this case there were, beside the
killing, two principal matters, one or the other of which

ought to have been established beyond reasonable doubt in the minds of the jury before they could properly convict the prisoner of murder.

One of these matters was that Gebhardt's attempt to arrest the prisoner was legal.   If that was shown beyond reasonable doubt, then the prisoner was proved to be guilty of murder. But certainly the legality of the arrest could not be assumed, and if it was not proved the arrest should. have been treated as any other unlawful interference with personal liberty, as an act which may be lawfully resisted.

The other matter would present itself for consideration, if the evidence failed to prove beyond reasonable doubt the legality of the arrest, and was whether, in resisting the arrest, the prisoner resorted to malicious, wanton or unreasonable violence.   For, if the prisoner, in resisting the illegal arrest, was not shown beyond reasonable doubt to have acted maliciously or wantonly or unreasonably, then the homicide was not proved to have been criminal at all; and if he was not thus shown to have acted maliciously or wantonly, then the homicide was not proved to have been murder.

Under the circumstances admitted at this trial, the mere killing did not, *as matter of law*, establish any criminality in the prisoner, and therefore did not cast upon him the burden of establishing any fact to the satisfaction of the jury, in order to justify his acquittal.   On the contrary, he was entitled to an acquittal, notwithstanding the killing, unless, upon the circumstances touching the legality of the arrest, or the maliciousness, wantonness or unreasonableness of the prisoner's conduct, the jury came to an undoubting conclusion adverse to his claims.   The direction to the jury that they should convict the prisoner of murder unless his claims on these points were substantiated to their satisfaction, was in my opinion erroneous.

Although in another part of the charge the jury were told in general terms to give the prisoner the benefit of reasonable doubt, yet in the explicit directions above quoted this general instruction was practically withdrawn as to all contested

questions, and the starting point for the deliberation of the jury was declared to be, not a presumption of his innocence, with the burden resting on the state to prove his guilt beyond reasonable doubt, but an assumption of the prisoner's guilt of murder, with the burden resting on him to establish to the satisfaction of the jury the illegality of his arrest and such other facts as would mitigate the offence or excuse the homicide.

So intelligible and so definite was the course which the learned judge thus marked out for the jury, that I am unable to assure myself that the verdict of the jury does not rest upon this view of their duty, and therefore I conclude that the judgment should be reversed.

In the determination of the cause the following questions were submitted to the court:

1. Is a statute which provides for the trial of criminal offences by a struck instead of a common jury, an infringement upon the constitutional provision "that trial by jury shall remain inviolate?"

*Yes*—None.

*No*—THE CHANCELLOR, CHIEF JUSTICE, DEPUE, VAN SYCKEL, DIXON, GARRISON, GUMMERE, LUDLOW, COLLINS, NIXON, HENDRICKSON, ADAMS.    12.

2. Is a provision in such statute, ordering peremptory challenges below the number allowed prior to the adoption of the constitution, in violation of the right of a person indicted for a criminal offence, guaranteed by the constitution?

*Yes*—THE CHIEF JUSTICE, DIXON, HENDRICKSON.    3.

*No*—THE CHANCELLOR, DEPUE, VAN SYCKEL, GARRISON, GUMMERE, LUDLOW, COLLINS, NIXON, ADAMS.    9.

3. Upon the whole cause shall the judgment of the Oyer and Terminer be affirmed?

*For affirmance* — THE CHANCELLOR, CHIEF JUSTICE, DEPUE, VAN SYCKEL, GARRISON, GUMMERE, LUDLOW, COLLINS, NIXON, ADAMS. 10.

*For reversal*—DIXON, HENDRICKSON. 2.